**UNITED STATES of America, Plaintiff,**

v.

**CITY OF PAINESVILLE, Defendant.**

**No. C76–324.**

United States District Court,
N. D. Ohio, E. D.

Jan. 19, 1977.

Peter R. Taft, Asst. Atty. Gen., Land Natural Resources Div., Alfred T. Ghiorzi, Chief, Pollution Control Section, Michael P. Carlton, Atty., Pollution Control Section, Washington D. C., Joseph A. Cipollone, Asst. U.S. Atty., Cleveland, Ohio, for plaintiff.

Charles E. Cannon, Milburn, Cannon, Stern & Aveni, Painesville, Ohio, for defendant.

## MEMORANDUM AND ORDER

MANOS, District Judge.

On April 2, 1976 the plaintiff, the United States of America, filed a complaint requesting that the defendant, the City of Painesville, a municipal corporation, be enjoined from operating a steam generating coal fired power unit in violation of the Clean Air Act, 42 U.S.C. § 1857c–6(e) and the Standards of Performance For New Stationary Sources, promulgated thereunder. *See,* 40 C.F.R. Part 60. The defendant filed a motion for summary judgment on April 23, 1976, and the plaintiff filed a motion for summary judgment, as to the defendant's liability, on July 30, 1976.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 42 U.S.C. § 1857c–8(b)(3).

## FINDINGS OF FACT

The facts of this case are undisputed. In 1966 the City of Painesville hired the engineering consultant firm of Glaus, Pyle & Schomer (Glaus) for advice on the possibility of expanding the electrical generating capacity of the Painesville Municipal Electric Utility (Municipal Electric). *See,* Painesville Ordinance No. 27–66, plaintiff's Appendix A. In 1967 Painesville city council decided that expansion of Municipal Electric was both feasible and necessary and started a construction program to build an additional coal fed electrical generating unit. The completion of Municipal Electric's expansion project was tentatively expected to be in early or mid 1972. *See,* Document 11, Appendix B.

On December 21, 1967 Painesville made its first purchase of equipment for the new generating unit; a used 25,000 kw turbogenerator at a cost of $118,000. *See,* Ordinance No. 46–67, Appendix A; Document No. 6, Appendix B. In November of 1969 Glaus submitted "specifications and proposals for pulverized coal fired steam generat-

ing unit no. 5." *See*, Document 12, Appendix B. On December 1, 1969 Painesville city council authorized the city manager to advertise for bids for the new generating unit (Unit No. 5) based on Glaus' specifications. *See*, Resolution No. 60–69, Appendix A. On April 20, 1970, after receiving bids on Unit 5, a letter of intent to enter into a contract for the construction of a boiler was sent to Combustion Engineering Inc. *See*, Document 18, Appendix B. At this point the start of construction appeared imminent. However financing difficulties caused delays and with each delay the cost of Unit 5 increased. *See*, Document 22, Appendix B. In August of 1971 Painesville discussed with Glaus ways to decrease the cost of Unit 5. *See*, Document 27, Appendix B.

On August 17, 1971 the Administrator of the United States Environmental Protection Agency (EPA) published in the *Federal Register* proposed standards for performance for new stationary sources. *See*, 36 Fed.Reg. 15704.

On September 20, 1971 Painesville informed Glaus that their services would no longer be needed. *See*, Document 11, Appendix C. On November 29, 1971 the engineering firm of Campbell, Deboe, Giese & Weber (Campbell) was hired. *See*, Resolution No. 52–71, Appendix A.

On December 23, 1971, the Standards of Performance for new source fossil-fuel fired steam generators became final. *See*, 36 F.R. 24877. Approximately one month later Campbell submitted a report on the proposed construction of Unit 5. In this report Campbell stated:

"Existing new federal air pollution regulations and proposed State of Ohio air pollution regulations which are scheduled to go into effect in February of this year are such that it is questionable if the boiler equipment is appropriate in all respects if furnished as originally contemplated. The new regulations cover emissions of particular matter, sulphur dioxide and nitrous oxides." *See*, Document 13, p. 6, Appendix C.

The report recommended a change in size of the boiler from 240,000 lbs. steam/hour (continuous rating) to 215,000 lbs. steam/hour (continuous rating). Painesville accepted the change in the boiler specifications, and on February 22, 1972 advertised for bids. *See*, Resolution 7–72, Appendix A. Bids were received and evaluated. One of the factors in the evaluation was whether the bids met the United States Environmental Protection Agency (EPA) and Ohio EPA regulations. Campbell noted that the bidders could only meet sulfur dioxide requirements by "fuel selection." *See*, Document 4, Exhibit C.

On July 28, 1972 Painesville executed a contract with Babcock & Wilcox Company for the construction of the steam generating unit of Unit 5. *See*, Appendix D, Document 5.

On May 17, 1973 the Ohio EPA found the City of Painesville was not required to meet Ohio's air quality standards contained in R.C. §§ 3704 *et seq.* because Unit 5 was not a new air contaminate source. The basis for this decision was that the contracts for purchase of the equipment for Unit 5 were made before the effective date of the Ohio Air Pollution Control Regulations, February 15, 1972. *See*, Defendant's Exhibit D. A consent and abatement order was later entered into by Painesville and Ohio EPA in which Painesville agreed to comply with Ohio particulate regulations and to burn coal containing less than 3.2% sulfur. *See*, Defendant's Exhibit B. On March 31, 1975, the EPA informed Painesville that it would not pursue enforcement of federal particulate emission standards because of the consent and abatement order, but the letter did not preclude EPA from enforcing sulfur dioxide emission standards. *See*, Document 3, Appendix D. On November 24, 1975 EPA issued notice that Painesville was in violation of 40 C.F.R. §§ 60.40 and 60.43 because it intended to burn coal with a 3% sulfur content which would cause in excess of 4.8 lbs. sulfur dioxide/million btu heat input to be emitted from Unit 5, a fossil-fuel fired steam generating unit with more than 250 million btu/hour heat input. *See*, Document 8, Appendix D. Under § 60.43 a

new stationary source may emit no more than 1.2 lbs. sulfur dioxide/million btu heat input. Painesville does not contest that Unit 5's emissions violate the standards set by 40 C.F.R. § 60.43 if they apply.[1] However, Painesville claims that 40 C.F.R. Part 60, Standards Of Performance For New Stationary Sources, does not apply because Unit 5 is not a new source as that term is used in 42 U.S.C. § 1857c–6(a)(2) and the regulations promulgated thereunder.

## CONCLUSIONS OF LAW

The sole issue[2] for determination is whether Painesville's Unit 5 is a new source that is required to meet the regulations contained in 40 C.F.R. Part 60.[3] 42 U.S.C. § 1857c–6(a)(2) reads,

"The term 'new source' means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source."

Proposed regulations for new source emissions were issued August 17, 1971, see, 36 Fed.Reg. 15704, so that if, as of August 17, 1971, "construction" or "modification"[4] of Municipal Electric had been "commenced," Unit 5 would not be a new source and therefore sulphur dioxide emission standards promulgated under 42 U.S.C. § 1857c–6 do not apply. The words "con-struction," "modified," and "commenced" are not defined in § 1857c–6 but have been defined in 40 C.F.R. § 60.2(g)(h) and (i) respectively. While an interpretation of an act by the enforcing agency is not conclusive, it is entitled to "great deference," *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *see, e. g., Youakim v. Miller*, 425 U.S. 231, 235–236, 96 S.Ct. 1399, 1402, 47 L.Ed.2d 701 (1976); *Satty v. Nashville Gas Company*, 522 F.2d 850, 854 (6th Cir. 1975). Further the interpretation by an administrative agency of its own regulations is controlling unless plainly erroneous. *See, e. g., Udall v. Tallman*, 380 U.S. 1, 17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Compton v. Tennessee Dept. of Public Welfare*, 532 F.2d 561, 565 (6th Cir. 1976).

In 40 C.F.R. § 60.2(g) "construction" is defined as the ". . . fabrication, erection or installation of an affected facility." An "affected facility" is defined in § 60.2(e) as meaning ". . . with reference to a stationary source, any *apparatus* to which a standard is applicable." (emphasis added). Standards are made applicable to fossil-fuel fired steam generators, like Unit 5, by § 60.40. A fossil-fuel fired steam generator is a boiler, see, 40 C.F.R. § 60.-41(a). It follows, in this case, that the "affected facility" of Unit 5 is the boiler, because it is the apparatus to which the emission standards are applicable. There-

1. Painesville admitted, ". . . we do not believe that compliance with the $SO_2$ emissions regulations is possible at this time. We are continuing to pursue the availability of low sulphur fuels and $SO_2$ removal equipment, with an ultimate plan of installing such equipment when it is commercially proven and available." *Letter from Joseph Pandy, Jr., Superintendent of Electrical Power to David Kee, Chief Air Section EPA Region V. Document 2, Appendix D; see also, Affidavit of Thomas Voltaggio, attached to motion for preliminary injunction.*

2. Painesville claims that the doctrine of laches is applicable and that EPA is barred from bringing this action because EPA knew about the consent and abatement between Ohio EPA and the defendant, but raised no objection until November of 1975. The Court rejects this argument. EPA's March 31, 1975 letter informed Painesville that EPA would not enforce federal standards for particulate emissions, at that time. No mention was made of sulfur dioxide standards. Painesville, from the record before this Court, had no reason to believe the decision not to enforce particulate emission standards meant that all other federal emission standards would also not be enforced.

3. The standards set by 40 C.F.R. § 60.43 have not been attacked by the defendant. 40 C.F.R. § 60.43 had been found to be reasonably achievable, in terms of cost and available technology. *See, Essex Chemical Corporation v. Ruckelshaus*, 158 U.S.App.D.C. 360, 486 F.2d 427, 440 (1973).

4. The defendant does not argue that the construction of Unit 5 was a "modification" or was the reconstruction of an existing facility. *See*, 40 C.F.R. § 60.2(h) and § 60.15.

fore it is the date of the "commencement" of "construction" of the boiler which determines whether Unit 5 is or is not a new source.

In 40 C.F.R. § 60.2(i) "commenced" is defined as meaning,

". . . with respect to the definition of 'new source' in Section 111(a)(2) of the Act, that an owner or operator has undertaken a continuous program of construction or modification or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification."

**5.** Painesville argues that it was engaged in a continuous program of construction, beginning in 1967 with the purchase of the used turbogenerator, and that it therefore "commenced" construction well before August 17, 1971 and need not comply with 40 C.F.R. § 60.43. However EPA has interpreted its own regulations as focusing on when construction of the boiler, as the affected apparatus, began. This interpretation is not clearly erroneous, but is a reasonable interpretation of the language of 40 C.F.R. §§ 60 *et seq.*

**6.** The definition by the EPA of the term new stationary source annunciated in 40 C.F.R. § 60.2(d), (e), (g), (h) and (i) is consistent with what appears to have been Congress' intent in enacting 42 U.S.C. § 1857c–6. The rationale behind § 1857c–6 was Congress' desire that the best available emission control technology be incorporated into the construction of a facility which posed a threat of being a *new* air pollution source. This would prevent further environmental decay over the short run, while decreasing air pollution from current levels over the long run. Further, the economic impact would be spread over many years, and would not be as drastic as requiring existing facilities to immediately incorporate the best available anti-pollution technology. As the Senate Conference Report stated:

"The provisions for new source performance standards are designed to insure that new stationary sources are designed, built, equipped, operated, and maintained so as to reduce emissions to a minimum. The performance standards should be met through application of the latest available technology or through other means of preventing or controlling air pollution. The maximum use of available means of preventing and controlling air pollution is essential to the elimination of new pollution problems while cleaning up existing sources.

"As used in this section, the term 'available control technology' is intended to mean that

Using this definition EPA argues that the construction of the "affected facility," the boiler, commenced at one of two times: First, when actual construction at the building site was started for a particular type of boiler, so that modification of existing physical construction would be required if the boiler specifications were changed to accommodate anti-pollution control devices; or, second, that construction commenced at the time a contract for the purchase of a new boiler was signed, with the proviso that delivery be required within a reasonable time. The Court finds that EPA's interpretation of 40 C.F.R. § 60.2(i).[5] is fully supported by the language of that regulation.[6]

the Secretary should examine the degree of emission control that has been or can be achieved through the application of technology which is available or normally can be made available. This does not mean that the technology must be in actual, routine use somewhere. It does mean that the technology must be available at a cost and at a time which the Secretary determines to be reasonable. The implicit consideration of economic factors in determining whether technology is 'available' should not affect the usefulness of this section. The overriding purpose of this section would be to prevent new air pollution problems, and toward that end, maximum feasible control of new sources at the time of their construction is seen by the committee as the most effective and, in the long run, the least expensive approach." *See*, Senate Report on S. 4358.

In testimony before a house subcommittee on the administration's clean air bill, which had a section similar to 1857c–6, H.E.W. Secretary, Robert H. Finch, stated,

"In general, *existing* stationary sources of air pollution are so numerous and diverse that the problems they pose can most efficiently be attacked by State and local agencies. Even with air quality standards being set nationally, as proposed in the Administration bill, the steps need to deal with existing stationary sources would necessarily vary from one State to another and, within States, from one area to another.

"In the years ahead, however, many potentially significant new stationary sources of air pollution will come into being as a result of the Nation's growing demands for electric power, manufactured goods, and other necessities and amenities of modern life. Large stationary sources, such as electric generating plants, iron and steel mills, and petroleum refineries frequently have adverse effects not only on public health and welfare in their own communities but also on air quality over broad geographic

■ Applying the above definition to the facts of this case the Court finds that of August 17, 1971 "construction" of Unit 5 had not "commenced." No contract for the production of a boiler for Unit 5 had been entered into. Construction of Unit 5 had not progressed to the point that a change in its design would have required the facility already erected to be modified in order to insure that it could comply with the sulfur dioxide emission standards of 40 C.F.R. § 60.43. In fact the Court finds in the record no evidence that any purchase of equipment made prior to August, 1971 would have been incompatible with a complying operation of Unit 5.[7] As is evidenced by the change in the specifications of the boiler in January of 1972, Painesville could have modified its plans for Unit 5 at a time well after the proposed regulations for new stationary sources became final, without loss of the money previously spent on capital purchases.[8]

■ The Court finds that Municipal Electric's Unit 5 is a *new stationary source*[9] subject to the emission standards established by 40 C.F.R. § 60.43. Further the Court finds that the burning of coal with the sulfur content of approximately 3.0% will cause the emissions of sulfur dioxide in excess of 1.2 lbs./million btu input heat. Summary judgment on liability is granted to the plaintiff, the United States of America. The parties are ordered to prepare plans with documentation, which would allow the operation of Unit 5 in compliance with 40 C.F.R. § 60.43 and at an economically acceptable level.

IT IS SO ORDERED.

areas. This problem is one that demands national attention. If we are ever to begin preventing air pollution, instead of just attacking it after the fact, then we must at least insure that major *new* stationary sources, wherever they are located are designed and equipped to reduce emissions to the minimum level consistent with available technology." Hearings before the Subcommittee on Public Health and Welfare of the Committee on Interstate and Foreign Commerce 91–44, p. 288.

Finally, Senator Cooper addressed the Senate on § 1857c–6, stated:

"The concept is that whenever we can afford or require new construction, we should expect to pay the cost of using the best available technology to prevent pollution." *See,* Legislative History of the 1970 Clean Air Act, p. 260 (Government Printing Office, Jan. 1974). The Court concludes that the EPA's definition that a new stationary source is one in which the boiler has neither been made nor contracted for, balances the interests in pollution control and economics along the lines required by § 1857c–6.

7. The defendants were on notice of the requirements of 40 C.F.R. § 60.43. *See,* Document 4, Exhibit C.

8. EPA's interpretation of 42 U.S.C. § 1857c–6(a)(2) limits the application of new stationary source emission standards to those projects in which construction has not progressed to the point that modifications of already completed physical structures would be necessary to meet those standards. But if the only work made

fruitless by the need to meet anti-pollution standards is in the design or planning of a new source, then operators are required to modify those designs or operating plans to meet new stationary source emission standards. This interpretation is given credence by Congress' use of the word "construction" in § 1856c–6(a)(2) rather than the words "planning" or "designing."

9. Ohio EPA found that Unit 5 was not a new stationary source under Ohio law. *See,* Appendix E, Document 1. Painesville argues that EPA is bound to follow this decision. This argument ignores the fact that Ohio EPA was interpreting a different statute than EPA. Further, it is clear that Congress intended that federal enforcement of federal air pollution standards not be controlled by the states. *See, Train v. Natural Resources Defense Council Inc.,* 421 U.S. 60, 63–64, 95 S.Ct. 1470, 1474, 43 L.Ed.2d 731 (1975).

In introducing the Conference Report to the House of Representatives' Congressman Staggers stated,

"The enforcement of air pollution regulations is partly the responsibility of the States and partly that of the Federal Government. The legislation provides that the Federal Government shall have primary responsibility for the enforcement of performance standards for new stationary sources and hazardous emissions stationary sources." *See,* Legislative History of the 1970 Clean Air Act, p. 112 (Government Printing Office, Jan. 1974).