650 F.2d 509
 16 ERC 1132, 11 Envtl. L. Rep. 20,815
 POTOMAC ELECTRIC POWER COMPANY, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Douglas M. Costle,
Administrator, and Jack J. Schramm, Regional
Administrator, Environmental Protection
Agency, Respondents.
 No. 80-1255.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 12, 1980.
Decided June 4, 1981.
 
 George V. Allen, Jr., Washington, D. C. (William P. Barr, Shaw, Pittman, Potts & Trowbridge, Washington, D. C., Alan G. Kirk, II, Potomac Electric Power Company, Washington, D. C., on brief), for petitioner.
 Bingham Kennedy, Dept. of Justice, Washington, D. C. (Todd Joseph, Environmental Protection Agency, Angus MacBeth, Acting Asst. Atty. Gen., David Mayer, Environmental Protection Agency, Washington, D. C., on brief), for respondents.
 Before WIDENER, PHILLIPS and ERVIN, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 The Potomac Electric Power Company (PEPCO) has petitioned this court, pursuant to § 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), for review of a decision of the Environmental Protection Agency (EPA), through one of its regional administrators, finding that the boiler at PEPCO's Chalk Point Unit $ 4 electric generating station is subject to the new source performance standard (NSPS), see 40 C.F.R. § 60.40 et seq., promulgated by the EPA for fossil fuel-fired steam generating units under the Clean Air Act, 42 U.S.C. § 7401 et seq. The regional administrator's decision was based on his determination that PEPCO had not "commenced construction" of the Chalk Point Unit $ 4 boiler prior to EPA's publication of the relevant NSPS on August 17, 1971.
 
 
 2
 Two questions are presented by PEPCO's petition for review of the regional administrator's decision.[1] First, is the EPA's interpretation of the regulations it has promulgated for determining whether an NSPS is to be applied to a particular facility "plainly erroneous"? Second, was the regional administrator's decision, on application of the EPA's regulations and interpretation of those regulations to the facts of this case, arbitrary, capricious or an abuse of discretion? Answering both questions in the negative, we affirm the decision of the regional administrator that PEPCO's Chalk Point Unit $ 4 must comply with the NSPS promulgated for fossil fuel-fired steam generators.
 
 
 3
 * Because the decision of the EPA concerning the applicability of an NSPS to a particular facility turns largely upon the facts of each case, a brief review of the facts underlying PEPCO's present petition for review is essential for an understanding of our disposition of this appeal. Chalk Point Units $ 3 and $ 4 are two of the four electric generating facilities that collectively comprise PEPCO's Chalk Point Generating Station south of Aquasco, Maryland. At the core of each unit is an oil-fired boiler designed to generate steam to power a turbine that produces electricity. The two units share several ancillary facilities, including a common water treatment system, fuel oil tank farm and control room, and a single building houses the boilers and turbines for both units. Units $ 3 and $ 4 were planned in the late 1960s as a single procurement and were to be placed in service "back to back" in 1974 and 1975. A sudden and unprecedented decline in electricity use following the Arab Oil Embargo of 1973, however, caused construction of both units to be slowed after their commencement. Unit $ 3 was placed in service in 1975; Unit $ 4 is scheduled to go into operation in the fall of 1981.
 
 
 4
 The information that PEPCO later submitted to the EPA indicates that negotiations for the construction of Unit $ 4 were commenced in 1970 and that PEPCO was dealing primarily with General Electric (GE), United Engineers & Constructors (UE&C) and Combustion Engineering (CE). PEPCO's negotiations with GE were for the main turbine-generator and boiler feed pump turbines. On March 12, 1971, PEPCO awarded the order to GE subject to the final approval of PEPCO's board of directors and mutually agreeable contract terms. On March 25, 1971, GE confirmed the order but stipulated that PEPCO could cancel the order without charge up to the earlier of the 30-month period prior to shipment or the release of the units for engineering and manufacturing. On June 30, 1971, PEPCO notified GE of approval of the order by its board of directors. On August 2, 1971, the units were released by GE for design and manufacture. A formal contract for the units, however, was not signed until April 23, 1973.
 
 
 5
 PEPCO's negotiations with UE&C were for engineering and construction services at the Chalk Point site. The contract for these services was signed on November 12, 1974 but had an "effective date" of April 12, 1971. This contract covered services for both Units $ 3 and $ 4. Prior to August 17, 1971, UE&C had developed drawings that indicated the planned construction of Unit $ 4. Site preparation for Unit $ 4, however, did not begin until late 1971.
 
 
 6
 PEPCO's negotiations with CE were for fabrication of the boiler to be used in Unit $ 4. On August 17, 1970, PEPCO received a price quotation from CE on a boiler unit for an undetermined facility; that boiler was eventually used in Unit $ 4. A CE "Parts Shipment Forecast" dated February 18, 1971 listed this unit for initial parts shipment during the first quarter of 1973. The unit was listed as a "Forecast Unit" that was identified by an internal control number as contrasted to listing as a "Booked Unit" identified by a domestic contract number.
 
 
 7
 On March 11, 1971, CE stated in a letter to PEPCO that it had committed space in its production schedule for the Unit $ 4 boiler pending a final decision by PEPCO. Also included in the letter were a price quotation and a projected delivery date. On July 12, 1971, PEPCO sent a letter to CE stating that "we are now considering a design for proposed Chalk Point No. 4." This letter concluded with the statement that, "(s)ubject to a mutually satisfactory contract, it is our intent to award the No. 4 boiler unit to you." This letter also referred to a meeting between PEPCO and CE to be held on August 3, 1971 to review a design proposal for Unit $ 4.
 
 
 8
 Although a CE engineering and production team began to design the Unit $ 4 boiler after CE's August 3 meeting with PEPCO, no subcontracts were let or materials acquired prior to August 17, 1971. On October 26, 1971, CE prepared a "Contract Abstract" for Unit $ 4 that included descriptions of the major boiler components, the total price, shipping and payment conditions, and an "award date" of July 12, 1971.
 
 
 9
 A formal contract for the Unit $ 4 boiler was not executed until April 18, 1973, at which time fabrication of the boiler was 75% complete. Affidavits later sworn to by PEPCO's Vice President for Nuclear Engineering and Environmental Affairs and CE's principal representative in the boiler negotiations, however, indicate that the parties felt that they had a binding agreement based on PEPCO's letter of July 12, 1971.
 
 
 10
 Construction of Chalk Point Unit $ 4, although slowed or "deferred" as a result of the 1973 oil embargo, has continued substantially uninterrupted to the present day. It was not until May 20, 1977, however, that PEPCO, pursuant to 40 C.F.R. § 60.5(a), requested a ruling from the EPA on whether Unit $ 4 would be subject to the NSPS for fossil fuel-fired steam generating units published by the EPA on August 17, 1971. Appended to this request were 156 pages of pertinent documents.
 
 
 11
 Fifteen months after receiving PEPCO's request, EPA communicated its first response to PEPCO a request for further information. This request, dated August 17, 1978, stated that the EPA had "preliminarily determined" that Unit $ 4 was subject to the 1971 NSPS for steam electric plants but requested additional information to determine the "exact status" of the unit. The reasons given for the EPA's preliminary determination were that construction of Unit $ 4 had been neither continuous nor of reasonable length, as required by 40 C.F.R. § 60.2(i). PEPCO supplied the requested information and urged that the EPA make its decision "just as quickly as possible."
 
 
 12
 At a meeting requested by PEPCO that took place on July 3, 1979, the EPA informed PEPCO for the first time that its ruling would turn on the question whether a "contractual obligation" to construct the Unit $ 4 boiler existed before August 17, 1971. Following PEPCO's compliance with two more EPA requests for information, the EPA staff briefed the regional administrator in October 1979 and again in March 1980. His final ruling on PEPCO's Chalk Point Unit $ 4 request was published on March 27, 1980. 45 Fed.Reg. 20,155 (1980). In this ruling the regional administrator determined that, because PEPCO had not entered into a "contractual obligation" on the Unit $ 4 boiler the "affected facility" in the present case PEPCO had not "commenced construction" at its Chalk Point Unit $ 4 prior to the EPA's publication of the NSPS for steam electric plants on August 17, 1971. He therefore concluded that the NSPS for steam electric plants was applicable to Unit $ 4.
 
 II
 
 13
 Before addressing the specific issues raised by this appeal, a brief discussion of the regulatory scheme out of which they arise is essential. Section 111 of the Clean Air Act, 42 U.S.C. § 7411, requires that the EPA promulgate new source performance standards (NSPS), reflecting the best demonstrated pollution control technology, for application to any new stationary source, "the construction or modification of which is commenced after the publication of (the NSPS) applicable to such source." The only statutory guidance that the EPA is given in promulgating the NSPS, however, is the definition of "stationary source" in § 111(a)(3) of the Clean Air Act, 42 U.S.C. § 7411(a)(3), as "any building, structure, facility, or installation which emits or may emit any air pollutant."
 
 
 14
 Based on this loosely defined statutory authorization, the EPA has promulgated a detailed regulatory scheme establishing and implementing the NSPS. See 40 C.F.R. Part 60. Included in this regulatory scheme is a subpart dealing with the procedural applications of the NSPS that are established in other subparts, see id. Subpart A, which is applicable "to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the date of publication in this part of any standard applicable to that facility," id. § 60.1 (emphasis added). The term "affected facility" is defined as "any apparatus to which a standard is applicable." Id. § 60.2(e). The word "construction" is defined as the "fabrication, erection, or installation of an affected facility." Id. § 60.2(g). The word "commenced" is defined to require a showing "that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification." Id. § 60.2(i) (emphasis added).
 
 
 15
 Based on its interpretation of the regulations it has promulgated pursuant to the authorization of § 111 of the Clean Air Act, 42 U.S.C. § 7411, the EPA has contended that PEPCO's Chalk Point Unit $ 4 is subject to the NSPS for steam electric plants because PEPCO was unable to establish that, prior to the EPA's publication of the applicable NSPS on August 17, 1971, it had entered into a "contractual obligation" for "construction" of its Unit $ 4 boiler which the EPA contends is the "affected facility" so that PEPCO could not cancel that obligation without incurring "significant liability," either because an agreed upon cancellation fee had come into operation or because the manufacturer of the facility had made expenditures in reliance upon an agreement for construction of the facility. PEPCO, on the other hand, has contended that, under well-settled principles of contract law, it had entered into a "contractual obligation" for the construction of Chalk Point Unit $ 4 generating station, based either on its contract with UE&C to construct the entire Unit $ 4 generating station which PEPCO contends is the "affected facility" or on its contract with CE to construct the boiler that is to be used in that generating station.
 
 
 16
 We note at the outset that some of PEPCO's contentions may be read as challenging not only the EPA's interpretation of its regulations but also the regulations themselves. To the extent that the regulations themselves are challenged, the challenge is untimely and in the wrong court; section 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b), requires that challenges to EPA regulations of nationwide applicability be brought within 60 days of promulgation in the United States Court of Appeals for the District of Columbia Circuit. Since the procedural regulations governing application of the NSPS that are now under consideration were promulgated by the EPA on December 23, 1971, see 36 Fed.Reg. 24,876 (1971), any challenge to those regulations could only have been brought in the District of Columbia Circuit on or before February 23, 1972. This court therefore has jurisdiction to review only the EPA's interpretation of those regulations, and the scope of that review is limited to whether the EPA's interpretation is plainly erroneous. See Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Talley v. Mathews, 550 F.2d 911, 919 (4th Cir. 1977).
 
 A.
 
 17
 With respect to whether a "contractual obligation" was entered into for Unit $ 4 prior to publication of the applicable NSPS, PEPCO has argued persuasively that it had entered binding contracts with UE&C and CE prior to August 17, 1971 or, at the very least, it was liable to those companies on a theory of promissory estoppel. However, while principles of contract law undoubtedly would have been reasonable standards by which to determine the existence of a "contractual obligation" for purposes of 40 C.F.R. § 60.2(i), the fact remains that contract law principles are not the standards that were chosen by the EPA for that purpose. Therefore, we must restrict our analysis in the present case to whether the "significant liability" test contended for by EPA is a plainly erroneous interpretation of "contractual obligation."
 
 
 18
 The EPA has presented two cogent policy reasons for the use of its "significant liability" standard. The first policy argument is based on the congressional goal in § 101 of the Clean Air Act, 42 U.S.C. § 7401, of ensuring the best demonstrated system of pollution control in new sources of air pollution without requiring costly retrofitting of existing sources of pollution. See H.R.Rep.No. 95-294, 95th Cong., 1st Sess. 184-86 (1977), U.S.Code Cong. & Admin.News 1977, p. 1077. The EPA interpretation of "contractual obligation" effectuates this goal by requiring a commitment to construction of a polluting facility that cannot be entered into simply for purposes of avoiding the NSPS requirements while leaving the polluting company the option of cancelling or postponing the commitment with the incursion of little or no liability. Stated another way, the EPA's interpretation effectively requires the incorporation of new pollution control technology by all those who can do so without incurring "significant liability" as a result of the cancellation of a previous commitment.
 
 
 19
 The second policy reason asserted by EPA is essentially one of administrative convenience. The requirement of significant liability, based on either a cancellation fee or expenditures made in reliance on a construction contract by the contractor for a polluting facility, provides bright-line documentation by which the EPA may quickly and easily determine whether an applicant for exemption from NSPS has incurred a "contractual obligation" meriting that exemption. This interpretation thus avoids the often convoluted application of contract principles to masses of business correspondence that would be the result under PEPCO's interpretation.
 
 
 20
 Support for this argument is amply supplied by PEPCO's contention in the present case that it is "common practice" in the utility industry for a utility to use a "letter of intent" to signify the award of a "binding contract" to a contractor for the construction of an electric generating facility and that PEPCO's "award letter" of July 12, 1971 to CE was such a letter of intent. For the EPA to find a "contractual obligation" on the basis of this contention, however, would require the EPA to gather evidence of the purported usage of trade in the utility industry and to then determine whether the "award letter" of July 12, 1971, or possibly some other piece of documentation submitted by PEPCO, comported with this "common practice." When this type of inquiry is multiplied by the number of different industries in which the NSPS regulations must be applied, the EPA's argument of administrative convenience is transformed into one bordering on administrative necessity.
 
 
 21
 PEPCO has argued that these policy considerations should be rejected as post hoc reasoning. This argument, however, is undercut by the EPA's consistent determination in three earlier decisions that utilities that fail to meet the requirements of the "significant liability" test will not be exempted from NSPS.
 
 
 22
 For example, upon the request of the United Illuminating Company for a determination whether its New Haven, Connecticut steam electric generating unit was subject to the NSPS for fossil fuel-fired steam generating units, see Letter from William J. Cooper, Chairman of the Board, United Illuminating Company to the Office of General Enforcement, Environmental Protection Agency (Feb. 29, 1972), reprinted in Joint Appendix at 222, the EPA originally ruled that the utility's conditional letter of intent to a manufacturer for fabrication of the facility's boiler did not constitute a "contractual obligation," see Letter from William H. Megonnell, Director, Division of Stationary Source Enforcement, Environmental Protection Agency to William J. Cooper (May 9, 1972), reprinted in Joint Appendix at 227. It reversed this ruling, however, when the utility was able to produce a purchase order from the boiler manufacturer to a supplier of parts to be used in manufacturing the boiler. See Letter from William H. Megonnell to William J. Cooper (Nov. 2, 1972), reprinted in Joint Appendix at 230.
 
 
 23
 Similarly, in ruling on a request for a determination of NSPS applicability from Tampa Electric Company, the EPA concluded that the utility's Big Bend Unit $ 3 was not subject to the relevant NSPS because the utility had incurred a "contractual obligation" based on an apparent liability to the boiler manufacturer of $950,000 as a result of certain purchase orders the manufacturer had entered with suppliers prior to August 17, 1971. See Memorandum from Charles A. Perry, Assistant Regional Counsel to Ron Hausmann, Office of General Counsel, Environmental Protection Agency (July 18, 1977), reprinted in Joint Appendix at 235-37; Memorandum from Edward B. Reich, Director, Division of Stationary Source Enforcement to Fran Phillips, Regional Counsel, Region IV, Environmental Protection Agency (Sept. 30, 1977), reprinted in Joint Appendix at 238-39.
 
 
 24
 Finally, in the request for determination of the Hawaiian Electric Company, the EPA was asked to rule on the applicability of the relevant NSPS to the utility's Kahe Power Plants $ 5 and $ 6. See Letter from Richard E. Bell, Manager, Environmental Department, Hawaiian Electric Company to Office of General Enforcement, Environmental Protection Agency (July 5, 1972), reprinted in Joint Appendix at 231-32. The cancellation date with respect to the Kahe Unit $ 5 boiler was listed as "none," and with respect to the Unit $ 6 boiler it was July 1, 1972. Id. Based on the assumption that Hawaiian Electric could withdraw without cost from its letters of intent to construct the two boilers prior to the expiration of the stated cancellation dates, the EPA held that the utility had incurred a "contractual obligation" for the first boiler prior to August 17, 1971 but that no such obligation arose for the second boiler until July 1, 1972. See Letter from Edward B. Reich, Chief, Enforcement Proceedings Branch, Environmental Protection Agency to Richard E. Bell (July 18, 1972), reprinted in Joint Appendix at 233-34. Although the "significant liability" standard was never expressly stated in any of these previous rulings, the reasoning applied in each of the decisions is consistent with the test now articulated by the EPA.
 
 
 25
 Judicial support for the EPA's present interpretation can be found in United States v. City of Painesville, 431 F.Supp. 496 (N.D.Ohio 1977), aff'd, 644 F.2d 1186 (6th Cir. 1981), in which the court upheld an NSPS applicability ruling by the EPA that is consistent with the "significant liability" standard. In Painesville a municipal utility had executed a letter of intent with one boiler manufacturer in 1970, but it changed the design of the boiler to be fabricated and, on July 28, 1972, executed a contract with a second boiler manufacturer for construction of the redesigned boiler. Id. at 498. The EPA argued that the commencement of construction of the "affected facility" dated from either the execution of a formal contract with the boiler manufacturer or the progression of construction at the building site to the point that a change in design would have required the facility already erected to be modified in order to comply with the relevant NSPS. Id. at 500. Adopting EPA's definition of "commencement" as a reasonable interpretation of the NSPS applicability regulations that was in keeping with the intent of Congress in enacting § 111 of the Clean Air Act, the district court found that "construction" of the new power plant had not "commenced" prior to August 17, 1971 because neither of the specified events had occurred prior to that time. Id. at 500-01. While the Painesville court admittedly did not construe the phrase "contractual obligation," it must be remembered that that phrase is found in the definition of "commenced" in 40 C.F.R. § 60.2(i) and that a finding of a "contractual obligation" must therefore be thought of as nothing more than a means of making the ultimate determination of whether "construction" has "commenced."
 
 
 26
 Based on the persuasive policy justifications presented by the EPA and that agency's consistent application of the "significant liability" standard, which has been upheld by other courts, we conclude that the EPA's requirement of "significant liability" to demonstrate a "contractual obligation" sufficient to exempt a pollution source from compliance with the relevant NSPS is not a plainly erroneous interpretation of 40 C.F.R. § 60.2(i).
 
 B.
 
 27
 A similar analysis can be applied to the EPA's conclusion that a power plant's boiler is the "affected facility" for which a "contractual obligation" had to exist for exemption in the present case. PEPCO contends that this interpretation is unreasonable and that the only reasonable interpretation is that "affected facility" refers to an entire electric generating facility and not just its boiler. The EPA's interpretation, however, is supported by a number of considerations.
 
 
 28
 First, EPA's interpretation comports with a tracing of the relevant regulations. "Affected facility" is equated in 40 C.F.R. § 60.2(e) with "any apparatus to which a standard is applicable." With respect to a steam electric plant, the "affected facility" to which the NSPS is applicable is "each fossil fuel-fired steam electric generating unit." Id. § 60.40(a)(1). "Fossil fuel-fired steam generating unit" is in turn defined as a "furnace or boiler." Id. § 60.41(a). Thus, the definition of "affected facility" as a "boiler" seems compelled by a reading of the pertinent regulations.
 
 
 29
 Second, the EPA's present ruling that PEPCO must demonstrate that it had incurred a "contractual obligation" concerning its Unit $ 4 "boiler" is consistent with the EPA's earlier NSPS exemption rulings. For example, in ruling on the request for exemption of United Illuminating Company, the EPA stated that the "pertinent issue is whether a binding agreement was entered into for the boiler, the 'affected facility' under 40 C.F.R. 60.40 and 60.41(a)." Letter from William H. Megonnell, Director, Division of Stationary Source Enforcement, Environmental Protection Agency to William H. Cooper, Chairman of the Board, United Illuminating Company (May 9, 1972), reprinted in Joint Appendix at 227-28. Similarly, in responding to a request for exemption by the Hawaiian Electric Company, the EPA stated that "the key question is whether construction of the K-5 and K-6 boilers commenced after August 17, 1971." Letter from Edward B. Reich, Chief, Enforcement Proceedings Branch, Environmental Protection Agency to Richard E. Bell, Manager, Environmental Department, Hawaiian Electric Company (July 18, 1972), reprinted in Joint Appendix at 233-34. Likewise, in reviewing its 1975 decision that Tampa Electric Company's "Big Bend No. 3 fossil fuel-fired boiler unit was an existing source for NSPS requirements," Memorandum from Charles A. Perry, Assistant Regional Counsel to Ron Hausmann, Office of General Counsel (July 18, 1977), reprinted in Joint Appendix at 235-37, the EPA focused its attention on the utility's "letter of intent to purchase a boiler from Riley-Stoker Company," coupled with the utility's "apparent liability to Riley-Stoker for $950,000," Memorandum from Edward B. Reich, Director, Division of Stationary Source Enforcement to Fran Phillips, Regional Counsel, Region IV (Sept. 30, 1977), reprinted in Joint Appendix at 238-39. Finally, in Painesville the EPA based its exemption determination on an examination of the time at which "construction of the 'affected facility,' the boiler, commenced," United States v. City of Painesville, 431 F.Supp. at 500, and the court found that examination to be "fully supported by the language of the regulation," id.
 
 
 30
 Third, the EPA's interpretation that the "boiler" is the "affected facility" in the instant case is consonant with the statutory definition of "stationary source" found in § 111 of the Clean Air Act, 42 U.S.C. § 7411. In ASARCO, Inc. v. EPA, 578 F.2d 319 (D.C. Cir. 1978), the District of Columbia Circuit held that the definition of "stationary source" limits the application of NSPS to individual polluting facilities rather than entire plants. At issue in ASARCO was a challenge to the EPA's use of the "bubble concept," under which an NSPS was applied as a result of a modification in a polluting facility only if the modification produced a net increase in the total emissions from the entire industrial plant in which a number of polluting facilities were grouped under an imaginary bubble. Id. at 321-25. The court rejected the "bubble concept" and held that under the § 111 definition of "stationary source" the EPA could not change the unit to which the NSPS applied "from a single building, structure, facility or installation the unit prescribed in the statute to a combination of such units." Id. at 327.
 
 
 31
 PEPCO contends, on the other hand, that the District of Columbia Circuit's holding in Alabama Power Co. v. Costle, 606 F.2d 1068 (D.C. Cir. 1979) (per curiam), prohibits the EPA from premising its exemption decision on an examination of the time at which construction is commenced on a "piece of equipment" such as a "boiler" rather than a "common sense industrial grouping" that is a "functional entity." Even assuming, arguendo, that Alabama Power, a decision dealing with a construction of the PSD provisions of the Clean Air Act has validity with respect to construction of similar provisions under the NSPS portion of that Act,[2] we simply do not believe that Alabama Power stands for the proposition for which PEPCO has cited it.
 
 
 32
 In Alabama Power the court was asked to pass on the validity of the EPA's regulatory definition of "source" to include "any structure, building, facility, equipment, installation or operation (or combination thereof) which is located on one or more contiguous or adjacent properties and which is owned or operated by the same person (or by persons under common control)." Id. at 1077. The court found that the EPA had "exceeded its statutory authority by including within its definition of 'stationary source' the terms 'equipment and operation.' " Id. The District of Columbia Circuit went on, however, to "rule that EPA has considerable latitude in defining the four remaining terms 'structure,' 'building,' 'facility' and 'installation' to include a wide range of pollution-emitting sources within the reach of the PSD provisions," and that "(t)o the extent EPA intended its definition of the term 'stationary source' to constitute an interpretation of the four statutory terms for purposes of the PSD part, it may recast its definition in appropriate fashion." Id. We believe that, with its emphasis on recasting the regulatory definition, the Alabama Power court intended to require only a procedural modification that would bring the EPA's regulation clearly within the discretion given that agency by the statute rather than a substantive restriction that prohibited the EPA from focusing on "equipment" or "operation" in any manner.
 
 
 33
 The Alabama Power court's use of the phrase "common sense industrial grouping" must similarly be reviewed in context. The EPA's previously quoted definition of "source" had been challenged as too broad by environmentalists, who relied on the District of Columbia's earlier holding in ASARCO that a "stationary source" could be comprised of only a single facility as opposed to a combination of facilities. Id. In attempting to distinguish ASARCO in such a way that the EPA could continue to use a definition of "stationary source" that included a combination of "sources," the Alabama Power court held that, while a "stationary source" could be comprised of only one "facility," the "EPA has latitude to define the term 'facility,' to encompass an entire plant or other 'common sense industrial grouping' appropriate to the PSD review and permit process." Id. Moreover, the court noted that the EPA had the discretion to broaden, in an appropriate fashion, its definition of "facility," which at that time was defined as " 'an identifiable piece of process equipment.' " Id. at 1977 n.14 (quoting 40 C.F.R. §§ 51.24(b)(5), 52.21(b)(6)). Thus, although the Alabama Power court recognized the "latitude" or "discretion" of the EPA to define "facility" as an "entire plant or other 'common sense industrial grouping,' " by negative implication it found nothing wrong with the existing definition of that term as "an identifiable piece of process equipment" a definition that is at least as narrow as the EPA's definition of "affected facility" in the present case as the "furnace or boiler."
 
 
 34
 The salient feature of the Alabama Power decision that PEPCO seems to overlook is the emphasis of the District of Columbia Circuit on a definition of "facility" that is "appropriate to the PSD review and permit process." Id. at 1077. Indeed, the Alabama Power court stated in a footnote following its discussion of the EPA's "latitude" in defining terms that "the definitions applicable to each set of provisions (PSD or NSPS) must be reasonably appropriate for the purpose of those sections." Id. at 1077 n.14.
 
 
 35
 The EPA has, we believe, pointed out a significant difference between the PSD and NSPS programs that justifies a different construction of the definition of "stationary source" that is to be applied to the two programs. It argues that, because the purpose of the PSD program is to preserve existing air quality in those portions of the country where the air is now cleaner than the National Ambient Air Quality Standards require, the emphasis in that program should be upon the net emissions from an entire plant resulting from construction or modification of one or more emitting sources within the plant. The NSPS regulations, on the other hand, require the use of the best demonstrated pollution control technology in the construction or modification of a pollutant-emitting facility without regard to the effect the emissions from that facility will have on overall air quality. It is therefore appropriate in the NSPS program for the EPA to focus on the "affected facility" to which the NSPS will be applied and in which the best demonstrated technology must be incorporated. Thus, we conclude that the EPA's emphasis in its exemption decision on the "boiler" as the "affected facility" constitutes neither too broad a definition of "stationary source" under ASARCO nor too narrow a definition of that term under Alabama Power.
 
 
 36
 Finally, and perhaps most persuasively, the EPA's requirement for exemption of a "contractual obligation" for construction of the "boiler" as the "affected facility" is supported by common sense. PEPCO contends that the EPA can base its exemption determination only on construction of a "functional entity" and that, therefore, the EPA should find an exemption if there was a "contractual obligation" for any portion of PEPCO's Chalk Point Unit $ 4, including its turbine generator and the equipment and buildings it shares with Unit $ 3, that is essential to its ultimate operation as a power plant. Such a construction, however, would create a means of avoidance of the NSPS that we do not believe Congress possibly could have intended. Through the simple expedient of planning generating units in tandem and providing for their use of some common equipment or facilities a practice that utility companies seem to follow often a utility could obtain exemption of both units from the NSPS even though it actually "commenced construction" of only one unit prior to publication of the relevant NSPS and the best demonstrated technology could be incorporated into the second unit at little or no retrofitting cost. Such a two-for-one exemption is obviously absurd, but it is the logical result of PEPCO's interpretation of the unit for which a "contractual obligation" must be incurred in order to qualify for an exemption.
 
 
 37
 We therefore conclude that it is not plainly erroneous for the EPA, in making its exemption determination, to focus on a power plant's boiler as the "affected facility" for which a "contractual obligation" had to exist prior to publication of the relevant NSPS.
 
 C.
 
 38
 While we conclude that it was reasonable for the EPA to focus on the "boiler" of Unit $ 4 as the "affected facility," we do not believe that construction of the equipment required to support that "boiler" is totally irrelevant to an NSPS exemption determination. The EPA contends that its regulatory definition of "construction" as "fabrication, erection, or installation of an affected facility," 40 C.F.R. § 60.2(g), refers only to "erection" or "installation" of an "affected facility" following its "fabrication." Although PEPCO has not expressly challenged this EPA interpretation, we believe such a challenge is implicit in PEPCO's contention that its contract with UE&C, which was responsible for preparation of the facilities that would accept the boiler, was a contract for construction of the boiler. Moreover, in response to this challenge, we find that the EPA's interpretation of its regulatory definition of "construction" is plainly erroneous.
 
 
 39
 We find that the only reasonable interpretation of the regulatory definition of "construction" is one that covers construction of those structures and facilities that are essential to the eventual "erection" and "installation" of an "affected facility." This finding is compelled by three considerations. First, limiting the scope of the words "erection" and "installation" to the actual erection and installation at the building site of an "affected facility" following its fabrication would render the words superfluous in the context of an NSPS exemption determination. The EPA's exemption decision would always turn on the existence of a "contractual obligation" for the "fabrication" of an "affected facility" that must necessarily precede its actual "erection" and "installation." Our interpretation, on the other hand, gives effect to all the words used to define "construction" in 40 C.F.R. § 60.2(g).
 
 
 40
 Second, the EPA's present interpretation of "construction" is inconsistent with the position taken by that agency in Painesville. Before the Painesville court the EPA argued that the construction of the "affected facility" in that case also a power plant boiler commenced "when actual construction at the building site was started for a particular type of boiler, so that modification of existing physical construction would be required if the boiler specifications were changed to accommodate anti-pollution control devices." United States v. City of Painesville, 431 F.Supp. at 500. While decision in Painesville turned on the reasonableness of the EPA's interpretation of its definition of "commenced" under 40 C.F.R. § 60.2(i), the EPA's present interpretation of "construction" conflicts with the position it took in Painesville because it has the effect of limiting examination for evidence of a "contractual obligation" to expenditures for "fabrication" of the "affected facility" and places "actual construction at the building site" outside the scope of review. Our interpretation, however, brings the EPA's definition of "construction" into consonance with its definition of "commenced."
 
 
 41
 Finally, the EPA's interpretation of "construction" is simply at odds with the congressional desire that industry not be required to institute costly retrofitting of existing facilities to accommodate the best demonstrated pollution-control technology mandated by the NSPS provisions. See H.R.Rep. No. 95-294, 95th Cong., 1st Sess. 184-86 (1977). As PEPCO has persuasively pointed out, the major expenditures incurred in incorporating new emission control technology into an electric generating unit are for expansion of buildings and modification of equipment that support an "affected facility" rather than for modification of the "affected facility" itself. Therefore, it would clearly thwart the legislative intent to look only at the "contractual obligation" for "fabrication" of the boiler in determining whether a utility's "construction" of a new generating facility had "commenced" to such an extent that it would be unreasonable to require the utility to modify that facility to accommodate new emission control technology. Our own interpretation, to the contrary, effectuates the congressional purpose in enacting the NSPS provisions by broadening the scope of examination of "construction" of an "affected facility" to include "contractual obligations" for the construction of facilities essential to the eventual "erection" and "installation" of an "affected facility."
 
 III
 
 42
 Having passed on the validity of the EPA's interpretation of the regulations essential to decision in the present case, we now turn to the question whether the regional administrator's ultimate decision denying an exemption to PEPCO was arbitrary, capricious or an abuse of discretion. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Although we note two flaws in the reasoning on which the regional administrator based his decision, we do not think that decision was an abuse of discretion inasmuch as our correction of the flaws does not change the ultimate result.
 
 
 43
 The regional administrator erred first in stating that it has been the "EPA's consistent interpretation of the term 'contractual obligation' in previous NSPS determinations" that it be demonstrated by an agreement that, if terminated, would result in a "substantial loss." 45 Fed.Reg. at 20,156. As we have already found, the requirement to be discerned from prior EPA decisions is one of "significant liability" rather than "substantial loss."[3] However, while we think that it is important to note the distinction between the two standards, we find that it has no effect on the validity of the regional administrator's ultimate decision in the present case because PEPCO has failed to demonstrate liability for construction of any sort, much less liability lying between "significant" and "substantial."
 
 
 44
 The regional administrator's other error was in restricting his examination for a "contractual obligation" for "construction" of the "affected facility" to PEPCO's possible liability for fabrication of the boiler itself. Under what we have determined to be the appropriate interpretation of "construction," as defined in 40 C.F.R. § 60.2(g), the regional administrator should have broadened the scope of his inquiry to include "contractual obligation" for the construction of structures and equipment essential to the eventual "erection" and "installation" of the "affected facility." Again, however, correction of this flaw in the regional administrator's decision has no effect on the ultimate exemption determination.
 
 
 45
 PEPCO has contended that, even if it had not incurred a "contractual obligation" for "fabrication" of the boiler by CE prior to the August 17, 1971 publication of the relevant NSPS, it had, prior to that date, entered into "contractual obligations" with GE for construction of the turbine-generator and with UE&C for the on-site construction of the entire Chalk Point Unit $ 4 facility. Because construction of the turbine-generator is not essential to the eventual "erection" and "installation" of the boiler, PEPCO's negotiations with GE are irrelevant under even our interpretation of "construction."PEPCO's possible "contractual obligation" to UE&C, on the other hand, is clearly relevant to the exemption determination in the instant case. PEPCO has failed, however, to produce any evidence of liability to UE&C for "construction" of the on-site structure essential to the eventual support of the boiler prior to August 17, 1971. At best, PEPCO can only point to "engineering work, project design and construction management" that UE&C had performed prior to publication of the relevant NSPS. As the Painesville court noted, however, "if the only work made fruitless by the need to meet antipollution standards is in the design or planning of a new source, then operators are required to modify those designs or operating plans to meet new stationary source emission standards," and such an interpretation "is given credence by Congress' use of the word 'construction' in (§ 111(a)(3)) rather than the words 'planning' or 'designing.' " United States v. City of Painesville, 431 F.Supp. at 501 n.8. Because PEPCO has been unable to produce any evidence of "significant liability" to UE&C for actual construction at the Unit $ 4 site prior to August 17, 1971, we believe that the regional administrator's failure to consider that possibility is inconsequential.
 
 
 46
 With the modifications indicated, we affirm the decision of the EPA's regional administrator denying exemption of PEPCO's Chalk Point Unit $ 4 from compliance with the relevant NSPS published by the EPA on August 17, 1971.
 
 
 47
 AFFIRMED AS MODIFIED.
 
 
 
 [1]
 PEPCO has also contended that it is entitled to relief from the ruling in any event because of the regional administrator's delay in making his determination. We find this contention to be without merit for two reasons
 First, although PEPCO cites a number of cases in which federal courts have compelled by injunction agency action wrongfully withheld in violation of a statutory duty, see, e. g., Deering Milliken, Inc. v. Johnston, 295 F.2d 856, 861-64 (4th Cir. 1961) and 5 U.S.C. § 706(1) provides the authority to "compel agency action unreasonably delayed," as the court found in EEOC v. Raymond Metal Products Co., 385 F.Supp. 907, 914 (D.Md.1974), aff'd, 530 F.2d 590 (4th Cir. 1976), § 706(1) "was clearly intended for situations where an agency has failed to take appropriate action and not for situations where the agency action has been taken in an allegedly unreasonable time." (Emphasis added.)
 Second, even if this court were to recognize PEPCO's potential right to relief, we believe PEPCO would be estopped from asserting any prejudice resulting from the EPA's delay in acting on its request for an NSPS exemption by its own lengthy delay in requesting that exemption. Although PEPCO began construction on its Chalk Point Unit $ 4 facility in late 1971, it did not ask for a ruling on the applicability of the NSPS to that facility, which PEPCO admittedly had the burden of requesting, 40 C.F.R. § 60.5(a), until 1977. PEPCO suggests that it only discovered the possibility of the NSPS' applicability to this facility two months prior to its request for a ruling. In view of the fact that several other utilities had long before requested rulings in this precise matter, we think that this major utility must be charged with at least constructive notice at a much earlier time, saving any question of actual notice.
 
 
 [2]
 The EPA's NSPS regulations are promulgated under the authority of § 111 of the Clean Air Act, 42 U.S.C. § 7411. The PSD regulations, however, find their statutory mandate in §§ 160-169 of the Act, 42 U.S.C. §§ 7470-7479. The unit to which the NSPS regulations are to apply is a "stationary source," which is defined as "any building, structure, facility, or installation which emits or may emit any air pollutant," § 111(a)(3), Clean Air Act, 42 U.S.C. § 7411(a) (3). Although the unit to which the PSD regulations are to apply is the facially different one of a "major emitting facility," that term is defined in § 169(1) of the Act, 42 U.S.C. § 7479(1), as any of a number of "stationary sources of air pollutants" that emit specified amounts of prohibited pollutants, and the Alabama Power court held that the definition of "stationary source" in § 111(a)(3) controlled the meaning of that term when used in the PSD part, Alabama Power Co. v. Costle, 606 F.2d at 1077. The court went on to point out, however, that the individual terms "facility," "building," "structure" and "installation" used to define "stationary source" in § 111(a)(3) are not defined by statute and that the EPA could define the terms differently to effectuate the different purpose of the NSPS and PSD provisions. Id. at 1077 n.13. Thus, the Alabama Power court's decision on the EPA's construction of those terms for purposes of the PSD part should be considered of little, if any, precedential value in construing the same terms for purposes of the NSPS regulations
 
 
 [3]
 The regional administrator's use of the phrase "substantial loss" is understandable because that was the term used in an internal agency memorandum directed to the regional administrator in March 1980. See Joint Appendix at 199-200. We do not believe, however, that the term was used in that memorandum or in the regional administrator's decision as a short-hand reference to the "substantial loss" standard that the EPA has applied in exempting sources from the PSD requirements. See, e. g., Montana Power Co. v. EPA, 608 F.2d 334, 340 (9th Cir. 1979). To the contrary, the discussion of EPA policy in which the term is used in the March 1980 memorandum, see Joint Appendix at 199, as well as the more detailed discussion in another memorandum directed to the regional administrator, see Memorandum from R. Sarah Compton, Director, Enforcement Division to Jack J. Schramm, Regional Administrator (March 7, 1980) reprinted in Joint Appendix at 174-98, clearly articulate a standard for establishing a "contractual obligation" that the EPA now refers to as one of "significant liability." Therefore, we regard the regional administrator's reference to "substantial loss" as a loose use of technical language rather than the application of a new and higher requirement for establishing a "contractual obligation." Moreover, even were the phrase used in the latter sense, as our subsequent discussion in text demonstrates, this error did not affect the ultimate outcome