**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**CITY OF PAINESVILLE, OHIO,
Defendant-Appellant.**

No. 78–3551.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 17, 1980.
Decided March 26, 1981.

James Van Carson, Squire, Sanders & Dempsey, Lee E. Larson, Cleveland, Ohio, Charles E. Cannon, Painesville, Ohio, for defendant-appellant.

James R. Williams, U. S. Atty., Cleveland, Ohio, Michael P. Carlton, Lawrence A. Hammond, James W. Moorman, Larry G. Gutterridge, Robert L. Klarquist, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before KEITH and BROWN, Circuit Judges, WISEMAN, District Judge.*

WISEMAN, District Judge.

The first of two questions before the Court is whether the district court erred in holding that a boiler operated by the Painesville Municipal Electric Utility is a "new source" under section 111(a)(2) of the Clean Air Act [the Act], 42 U.S.C. § 7411(a)(2) (Supp. III 1979).[1] The second issue is whether the district court was required to hold an evidentiary hearing before permanently enjoining the City of Painesville from emitting sulfur dioxide from its boiler in excess of the Environmental Protection Agency's [EPA's] "new source" standards for sulfur dioxide [$SO_2$]. The Court answers both questions negatively, and accordingly the actions of the district court are affirmed.

## Section 111 and the New Source Performance Standards

In *ASARCO, Inc. v. EPA*, 578 F.2d 319, 321–22 (D.C.Cir.1978), Judge Skelly Wright provided a succinct overview of the 1970 amendments to the Clean Air Act, and it serves equally well as an introduction to the instant case. According to Judge Wright (now Chief Judge of the D.C. Circuit), the 1970 amendments to the Clean Air Act were passed in recognition of the failure of state governments to cooperate with the

federal government in effectuating the Act's commitment "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Clean Air Act § 101(b)(1), 42 U.S.C. § 7401(b)(1). *See generally* W. Rodgers, Environmental Law § 3.1 (1977). The 1970 changes were designed to increase the federal government's role in the battle against air pollution. *See Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 64, 95 S.Ct. 1470, 1474, 43 L.Ed.2d 731 (1975). The amendments require the states to develop pollution control programs (State Implementation Plans) that will keep levels of certain air pollutants below the National Ambient Air Quality Standards set by EPA. Clean Air Act §§ 109, 110, 42 U.S.C. §§ 7409, 7410.

The 1970 amendments also added section 111, which is at issue on this appeal. Section 111 directs EPA to set specific, rigorous limits on the amounts of pollutants that may be emitted from "new sources" of air pollution. The New Source Performance Standards established under this section are designed to force new sources of targeted air pollutants to employ the best demonstrated systems of emission reduction. 42 U.S.C. § 7411(a)(1). Because these New Source Performance Standards are likely to be stricter than emission standards under State Implementation Plans, plant operators have an incentive to avoid application of the new source standards. Such a situation is presented by the instant case; EPA's new source standard for coal-fired steam generators allows 1.2 lbs. $SO_2$/mBtu, while the Ohio plan would impose a limit of 2.1 lbs./mBtu on Painesville's boiler.

## The Facts

The government, at the request of EPA, filed a complaint in the Northern District of

* Honorable Thomas A. Wiseman, Jr., District Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

1. The Clean Air Act was first enacted in 1955 and there have been frequent amendments, most notably in 1970 and 1977. *See* Clean Air Amendments of 1970, Pub.L.No.91–604, 84 Stat. 1676; Clean Air Amendments of 1977, Pub.L.No.95–95, 91 Stat. 685. At the time this litigation began, the Act was codified at 42 U.S.C. § 1857, *et seq.* The 1977 amendments rearranged many provisions of the Act and recodified it at 42 U.S.C. § 7401, *et seq.* 42 U.S.C. § 7411(a)(2) was formerly codified at 42 U.S.C. § 1857c–6(a)(2) (1976).

Ohio against the City of Painesville on April 4, 1976. The complaint alleged that the coal fired boiler in Unit No. 5 of the electrical generating plant operated by the Painesville Municipal Electric Utility [Boiler No. 5] was emitting sulfur dioxide in excess of the permissible standards established by EPA pursuant to section 111(b) of the Act. EPA's $SO_2$ standard for new sources, which is published at 40 C.F.R. § 60.43 (1980), allows 1.2 lbs. $SO_2$/mBtu derived from solid fossil fuel. The complaint alleged that Boiler No. 5 emits 4.8 lbs. $SO_2$/mBtu heat input, thereby constituting a violation of section 111(e) of the Act,[2] which makes it unlawful to violate the standards of performance established by EPA.

The City has never denied that Boiler 5 exceeds the $SO_2$ new source standard, but it has consistently maintained that Boiler No. 5 is not a new source at all. Ultimately, the issue of whether Boiler No. 5 is a new source was the sole issue presented to the district court on cross-motions for summary judgment, and the district court's holding that Boiler No. 5 is a new source under section 111(a)(2) established the City's liability for violating the Act. *See United States v. City of Painesville*, 431 F.Supp. 496, 501 (N.D.Ohio 1977).

In his January 19, 1977, Memorandum awarding summary judgment to the government, District Judge Manos ordered the parties to prepare plans for the operation of Boiler No. 5 so that it would comply with the 1.2 lbs./mBtu standard. The parties entered "lengthy and thorough discussions"[3] under the court's supervision, but they failed to reach agreement on a plan. Consequently, on June 18, 1978, the district court issued an injunction ordering the City to comply with the $SO_2$ standard, Judge Manos having concluded that further negotiations would be fruitless. There was no hearing on this injunction, but the judge stayed the effect of his order pending this appeal.

## Discussion

On this appeal, the City challenges both the district court's finding of liability in its award of summary judgment and its issuance of an injunction without a prior evidentiary hearing. The City raises three arguments in opposition to the finding of its liability. First, the City maintains that the D.C. Circuit's remand in *Essex Chemical Corp. v. Ruckelshaus*, 486 F.2d 427, 441 (D.C.Cir.1973), *cert. denied sub nom. Appalachian Power Co. v. EPA*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 588 (1974), operated to remove the boiler's status as a new source. Second, the City asserts that EPA erroneously applied its own regulations in determining that Boiler No. 5 was a new source or, third, that EPA, in its regulations, misinterpreted the statutory definition of "new source" found at section 111(a)(2). In challenging the district court's granting of injunctive relief, the City maintains that equitable principles required the court to hold an evidentiary hearing before issuing the permanent injunction. These arguments will be discussed in order.

### A. The District Court's Summary Judgment

#### 1. The Effect of Essex Chemical Corp. v. Ruckelshaus

In *Essex Chemical Corp. v. Ruckelshaus, supra,* the D.C. Circuit reviewed EPA's sulfur dioxide, particulate matter, and nitrogen oxide standards for coal-fired steam generators. The court approved the particulate matter and nitrogen oxide standards, but it remanded the record for further consideration by EPA of the adverse environmental effects that might result from requiring a 1.2 lbs./mBtu standard for coal-fired steam generator plants that must use a "lime slurry scrubbing system" in order to achieve the $SO_2$ standard. Such systems produce a great deal of solid waste in the form of sludge, and the circuit court con-

---

2. Section 111(e) provides as follows:

(e) Prohibited Acts. After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of any new source to oper-

ate such source in violation of any standard of performance applicable to such source. 42 U.S.C. § 7411(e).

3. *United States v. City of Painesville*, No. C76–324 (Order of June 18, 1978).

cluded that EPA had not given adequate consideration to the environmental problems posed by this form of solid waste.[4] *Essex* was decided on September 10, 1973, approximately two years after the proposed 1.2 lbs./mBtu standard had been published on August 17, 1971. 36 Fed.Reg. 15,704 (1971).

▉ The City argues that the *Essex* remand retroactively voided the proposed $SO_2$ standard published on August 17, 1971, so that there was no new source standard for $SO_2$ in effect when the City entered its contract to purchase Boiler No. 5 on July 28, 1972.[5] This proposition is taken one step further, however, by the City's argument that the remand of the $SO_2$ standard lifted Boiler No. 5 out of the class of new sources altogether, with the result that the new source standard for $SO_2$ ultimately adopted by the EPA after the *Essex* remand (1.2 lbs. $SO_2$/mBtu, the same standard) was inapplicable to Boiler No. 5.[6] In other words, the City maintains that if the D.C. Circuit remands a record for a new source standard so that the EPA can reconsider the substantive standard, that action effectively obliterates not only the standard, but the class of new sources to which the standard was applicable. Moreover, the former new sources are forever relieved of complying with any future new source standards. Another class of new sources would come into existence only when EPA publishes a response to the remand, and that class becomes fixed only when the D.C. Circuit approves the reconsidered standard.

The City's argument is completely at odds with the plain meaning of the statute. Section 111(a)(2) provides as follows:

The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source. 42 U.S.C. § 7411(a)(2).

The statute unambiguously establishes the benchmark for determining which sources of a particular pollutant are new sources. "[T]he publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance ... which will be applicable to such source" determines what sources are new; a source whose construction commenced after such publication is subject to the new source standards, whatever they might be or become. The City argues, in effect, that new sources of $SO_2$ remain unknown until the D.C. Circuit approves an "ultimate" $SO_2$ standard. This argument must fail, however, because Congress provided that even the publication of *proposed* regulations establishes the cut-off date for identifying new sources of a particular pollutant. A proposed regulation is, of course, subject to both administrative and judicial review and, consequently, modification. By identifying new sources with reference to the publication date of a proposed standard, Congress eschewed the City's position that new sources of $SO_2$ remain unknown until the substantive standard becomes unreviewable. The City's argument confuses the criteria for identifying new sources with the validity of substantive new source standards.

If the *Essex* remand invalidated the 1.2 lbs./mBtu standard (an extensively disput-

---

4. A lime slurry scrubbing system was the anticipated "best system" for achieving the SO2 standard of performance. *See* 486 F.2d at 440.

5. Under the EPA's regulations as applied to the instant case, the date of the purchase contract for the boiler was· the date upon which construction "commenced" under section 111(a)(2) of the Act, which defines new sources. 40 C.F.R. § 60.2 (1980). The statute provides that if the construction of a new source is commenced before the publication of proposed reg-

ulations prescribing a standard of performance for the particular source, that source will not be included in the class of new sources.

6. On September 10, 1975, EPA published its initial response to the *Essex* remand, concluding that no change in the SO2 standard was warranted. 40 Fed.Reg. 42,045 (1975). EPA stood by this conclusion in its final response to *Essex* on November 23, 1977. 42 Fed.Reg. 61,541 (1977).

ed but ultimately irrelevant point), the City could not have violated the $SO_2$ new source standard until EPA responded to the remand on September 10, 1975. *See* 40 Fed. Reg. 42,045 (1975). But given the plain meaning of the statute, the *Essex* remand had no effect on Boiler No. 5's status as a new source within the meaning of section 111(a)(2). That status was conferred on August 17, 1971, the day EPA published proposed $SO_2$ standards for coal-fired boilers. *See* 36 Fed.Reg. 15,704 (1971). Once Boiler No. 5 became a new source, it remained a new source regardless of what happened to the 1.2 lbs./mBtu standard. The Court therefore rejects the City's argument that the *Essex* remand somehow nullified Boiler No. 5's obligation to comply with the 1.2 lbs./mBtu new source performance standard for $SO_2$ that was in effect when the government brought this action in April 1976.

### 2. EPA's Interpretation of Its Own Regulations

In pursuing its legislative mandate under section 111(b) of the Act to create performance standards for new sources of air pollution, EPA adopted regulations to construe the statutory definition of "new source" set forth in section 111(a)(2) of the Act:

> (2) The term "new source" means any stationary source, the *construction* or modification of which is *commenced* after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source (emphasis added).

EPA adopted this definition of "construction": "Construction" means "fabrication, erection, or installation of an *affected facility.*" 40 C.F.R. § 60.2 (1980) (emphasis added). With reference to a stationary source, an "affected facility" is "any apparatus to which a standard [of performance] is applicable." 40 C.F.R. § 60.2 (1980). In regard to the City's electrical generating plant, EPA concluded that the boiler "apparatus" was the "affected facility," and thus the commencement date of its construction determined whether the City would have to comply with the new source standards.

EPA interpreted the statute's use of the word "commenced" in this fashion:

> (i) "Commenced" means, with respect to the definition of "new source" in section 111(a)(2) of the Act, that an owner or operator has undertaken a continuous program of construction or modification or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification.

40 C.F.R. § 60.2 (1980).

The City did not contract for the purchase of Boiler No. 5 until July 28, 1972, almost a full year after the cut-off date for new sources of $SO_2$ (August 17, 1971). Consequently, EPA concluded that because the construction of Boiler No. 5, the "affected facility," commenced after August 17, 1971, it was a new source.

■■■ The City argues that EPA misinterpreted its own regulations in concluding that the boiler is a new source. An agency's interpretation of its own regulations is controlling unless plainly erroneous. *See, e. g., Udall v. Tallman,* 380 U.S. 1, 17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Compton v. Tennessee Dept. of Public Welfare,* 532 F.2d 561, 565 (6th Cir. 1976). Having reviewed EPA's regulations set forth above and the agency's application of them to the instant case, the Court cannot find that EPA's interpretation is plainly erroneous.

### 3. EPA's Interpretation of Section 111(a)(2) of the Clean Air Act

■■ Apart from its argument that EPA misapplied its own regulations, the City also argues that EPA's regulations misinterpret the statutory definition of "new source" found in section 111(a)(2). Section 10(e) of the Administrative Procedure Act defines the scope of judicial review of EPA's regulations interpreting the Clean Air Act. A reviewing court is required to determine whether the agency's action was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5

U.S.C. § 706(2)(C) (1976). *See ASARCO, Inc. v. EPA*, 578 F.2d 319, 325 (D.C.Cir. 1978). EPA's interpretation of the Clean Air Act is to be given considerable deference, however. *Id.*

The City's argument is essentially economic; the City maintains that because it will be very expensive to comply with the $SO_2$ new source standards,[7] Congress could not have meant to inflict such expense on an operator in the City's position. The City emphasizes that it began planning for the construction of a new Unit No. 5 (consisting of the boiler, a turbogenerator set, and auxiliary equipment) in 1966 after determining that it would need additional power generating capacity if it wished to remain in the business of generating electricity. Thereafter, the City purchased a 25,000 kW turbogenerator, hired consulting engineers to begin design work on the plant expansion, and passed ordinances to finance the construction. In April 1970 the City even signed a letter of intent to enter a contract to purchase a certain boiler, but that contract was never executed.

The City maintains that it is "harsh and unreasonable" to require compliance with the $SO_2$ new source standards, because if it had known in 1966 that its utility would have to bear the expense of complying with such standards, the City might well have decided to close its generating facility instead of initiating the construction program. Moreover, if the $SO_2$ standards are now applied to Boiler No. 5, the Painesville utility might become noncompetitive with the adjacent large utility that could supply Painesville's customers. The City acknowledges that it did not contract for its boiler until after the $SO_2$ standard was published, but it also maintains that this circumstance is relatively insignificant in light of the major efforts that had been undertaken in contemplation of constructing Unit No. 5.

The Court is sympathetic to the City's potential economic burden, but the unambiguous language of section 111(a)(2) easily bears EPA's interpretation of it. The statute plainly provides that new sources are those whose construction is commenced after the publication of the particular standards of performance in question. Given this statutory language, EPA would not have exceeded its authority even if its regulations had defined the commencement of construction as the time of groundbreaking. EPA was more lenient, however, and defined commencement of construction as, in essence, the time when a purchase contract for a polluting apparatus is executed. *See* 40 C.F.R. § 60.2 (1980). The statutory language compels the conclusion that EPA's regulations identifying Boiler No. 5 as a new source of $SO_2$ do not exceed EPA's congressionally mandated authority.

Because the statute alone unambiguously allows EPA's interpretation, there is no need to consider the legislative history of the 1970 Clean Air Amendments. *See United States v. Sutton*, 642 F.2d 1001, —— (6th Cir. 1980). The Court will briefly observe, however, that the legislative history weighs heavily against the City's position. The City's basic complaint is that compliance with the $SO_2$ new source standard will be expensive, and from that premise it attacks EPA's statutory authority to impose such costs on the City, in its particular circumstances. However, the legislative record demonstrates a congressional awareness that compliance with new source standards would be costly. Nonetheless, the choice was made to impose those costs. As stated in the Senate Report, "maximum feasible control of new sources at the time of their construction is seen by the committee as the most effective, and in the long run, the least expensive approach." S.Rep.No.1196, 91st Cong., 2d Sess. 16 (1970), *reprinted in* Legislative History of the Clean Air Amendments of 1970, at 416 (Comm. Print 1974) [hereinafter cited as Legislative History]. This passage reflects a congressional decision that the short-term costs of "maximum feasible control" are ultimately less expensive than the long-term costs of increasing air pollution. As Senator Cooper stated during the Senate debate on the new source standards, "[t]he

---

7. The record does not show how expensive compliance will be, however.

concept is that whenever we can afford or require new construction we should expect to pay the cost of using the best available technology to prevent pollution." Referring to the Clean Air Amendments in general, Senator Cooper went on to observe that the 1970 Act "assumes a readiness by industry and the people or [*sic*] the country to pay the costs of pollution control." 116 Cong.Rec. 32918, 32919 (1970), *reprinted in* Legislative History 260, 262. Even more illuminating is an exchange between Senator Muskie and Senator Randolph during Senate consideration of the Conference Report on December 18, 1970. In response to an inquiry from Senator Randolph, Senator Muskie stated that the new source performance standards "undoubtedly will have an economic impact all across this country." Senator Randolph then stated: "Yes, it will, and it will be costly. And yet the ugly face of pollution must be erased." 116 Cong. Rec. 42392 (1970), *reprinted in* Legislative History 145. A clearer recognition of the economic impact of new source standards could hardly be imagined. *Cf. Cleveland Electric Illuminating Co. v. EPA*, 572 F.2d 1150, 1164 (6th Cir.), *cert. denied sub nom. Timken Co. v. EPA*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978) (upholding EPA's $SO_2$ control plan for Ohio).[8]

The Court's only reservation about the applicability of new source standard to Boiler No. 5 is based on what appears to have been one of the primary aims of the new source standards. As stated in the House Report:

> The promulgation of Federal emission standards for new sources in the aforementioned categories will preclude efforts on the part of States to compete with each other in trying to attract new plants and facilities without assuring adequate control of extra-hazardous or large-scale emissions therefrom.

H.R.Rep.91–1146, 91st Cong., 2d Sess. 3, *reprinted in* Legislative History 893; [1970] U.S.Code Cong. & Ad.News 5356, 5358. The new source standards prevent industries from "shopping around" for "pollution havens" that might otherwise exist if the states were allowed any flexibility in setting standards for new sources. *See* 116 Cong.Rec. 32902 (1970) (remarks of Senator Muskie), *reprinted in* Legislative History 227; Environmental Law Institute, Federal Environmental Law 1104 (1974). Such shopping around is foreclosed by the new source standards, because they set a nationwide "floor" on permissible levels of pollution from new sources. *See* Clean Air Act § 116, 42 U.S.C. § 7416; W. Rodgers, Environmental Law § 3.2, at 217 (1977). Because the new source standards must reflect "the application of the best technological system of ... emission reduction," 42 U.S.C. § 7411(a)(1), this federal standard will invariably equal or exceed the standard imposed by State Implementation Plans for existing sources adopted pursuant to section 110 of the Act, 42 U.S.C. § 7410.[9] *See ASARCO, Inc. v. EPA, supra*, 578 F.2d at 322. Consequently, there is no incentive for industries to move to relatively pollution-free states whose implementation plans for achieving the National Ambient Air Quality Standards might be more accommodating to new industry.

Painesville's municipal electrical utility is obviously not in a position to "shop around" for another location, and thus the "pollution haven" rationale for the new source standards does not apply. If the sole purpose for section 111 were to prevent states from adopting different new source standards in order to compete with each other for new industry, the Court would be inclined to read a "municipal utility exception" into

---

**8.** For all of the reasons discussed in text, the Court disagrees with the decision of the district court in *United States v. Public Service Commission*, 12 Envir.Rep. (BNA) 1495, 1502 (S.D. Ind.1977). That court concluded that EPA's regulations at 40 C.F.R. § 60.2 defining "stationary source," "affected facility," "construction," and "commenced" are contrary to the Clean Air Act's definition of "new source" in section 111(a)(2).

**9.** For example, the Ohio plan for existing sources of SO2 would allow Boiler No. 5 to emit 2.1 lbs. SO2/mBtu, while the federal new source standard imposes a much stricter limit of 1.2 lbs./mBtu.

the statute, because such utilities are simply not in a position to seek "pollution havens." It is apparent, however, that the overriding purpose of section 111 is to prevent significant new pollution problems, without regard to existing ambient air quality conditions. *See* H.R.Rep.91–1146, *supra*, at 3, 5, *reprinted in* Legislative History 893, 895; [1970] U.S.Code Cong. & Ad.News, *supra*, at 5358, 5360–61; 116 Cong.Rec. 33075 (1970) (remarks of Sen. Randolph), *reprinted in* Legislative History 289. The Senate Report specifically found that electrical generating plants must be controlled to the "maximum possible degree," and it directed EPA to establish new source standards for power plants. S.Rep.No.91–1196, *supra*, at 16; Legislative History 416. No exception was made for municipalities.[10] The Conference Committee agreed that power plants should be subject to new source standards, and the Committee did not suggest any exception for municipalities. *See* 116 Cong. Rec. 42384 (1970), *reprinted in* Legislative History 130. The new source standards were drafted to "insure that major new stationary sources, wherever they are located, are designed and equipped to reduce emissions to minimize feasible levels." New source standards also tend to minimize the competitive advantage of locating new facilities in areas where emission standards might otherwise be less rigorous, but this was not the *primary* purpose of section 111. *See* Hearings on Air Pollution Control Before the Subcomm. on Public Health and Welfare of the House Comm. on Interstate and Foreign Commerce, Legislative History 1369 (statement of Robert Finch, Secretary of Health, Education, and Welfare). Accordingly, the Court will not infer an exception to the statute that would relieve municipalities from complying with new source standards.

In summary, the Court holds that the EPA regulations defining "affected facility," "commenced," and "construction," 40

C.F.R. § 60.2, as applied to the instant case, do not exceed EPA's statutory authority.

## B. The Lack of an Evidentiary Hearing on the Injunction

■ The City argues that Judge Manos should have held a formal evidentiary hearing before issuing his June 18, 1978, injunction that requires Boiler No. 5's compliance with the SO₂ new source standard. The argument is based on the premise that "the appropriate principles of inadequate remedy at law and irreparable harm must be established" before a court orders injunctive relief. The City argues from this premise that the district court violated these traditional equitable principles by not holding a hearing to establish inadequacy of a legal remedy and irreparable harm, and the City asks this Court to remand for such a hearing.

Section 113(b) of the Act, 42 U.S.C. § 7413(b), empowers district courts to provide injunctive relief for violations of section 111(e), which prohibits violations of EPA new source standards. In *Hecht Co. v. Bowles*, 321 U.S. 321, 330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944), the Supreme Court emphasized that when a court is called upon to enforce a federal statutory injunction, its reliance upon the traditional practices of equity must be "conditioned by the necessities of the public interest which Congress has sought to protect." In enacting the Clean Air Act, Congress made a determination that the public interest required that substantial measures be taken to combat the deleterious effects of air pollution. *See* 42 U.S.C. § 7401. The district court's discretionary injunctive powers were therefore tempered by its obligation to carry out the congressional mandate contained in the Clean Air Act.

In a recent case, *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (the "snaildarter" case), the Court held that the Endangered Species Act required the

---

**10.** The Senate specifically included municipal incinerators as a stationary source that should be subject to new source standards. This circumstance strongly suggests that the Senate did not intend to create any "municipality ex-

ceptions" to the new source standards, even though the "pollution haven" rationale would not apply to municipal incinerators, just as it is inapplicable to municipal electrical generators.

district court to enjoin the completion of the Tellico Dam in East Tennessee, despite the lower court's doubts about the "wisdom ... of a particular course consciously selected by the Congress." *Id.* at 194, 98 S.Ct. at 2301. The Court emphasized that it is the exclusive province of Congress to formulate legislative policies and establish their relative priority. Moreover, "[o]nce Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought." *Id.* Although the Court recognized that a federal court is not "mechanically obligated" to grant injunctive relief for every violation of the law, the Court concluded that the clear congressional mandate of the Endangered Species Act provided no alternative but to enjoin the completion of the Tellico Dam, regardless of the expenses that had already been incurred in its near-complete construction.

By enacting the Clean Air Act, Congress established a high priority for the control of air pollution. The legislature recognized that compliance would be expensive in some cases, but the choice was made to require compliance with the standards promulgated by EPA. Having made that choice, Congress did not contemplate that its decision would be thwarted by judicial reluctance to require compliance when enforcement proceedings are brought and liability is proven. Accordingly, this Court holds that the district court was required to order injunctive relief upon its finding of liability, once negotiations for a compliance plan broke down. A hearing to determine the presence of irreparable injury and inadequacy of legal remedy was therefore unnecessary.

Affirmed.