**SIERRA PACIFIC POWER COMPANY and Idaho Power Company, Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

Nos. 79–7542, 80–7301.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1981.

Decided June 5, 1981.

---

Tom Watson, Crowell & Moring, Washington, D. C., argued for petitioners.

Earl Salo, EPA, Washington, D. C., argued, Angus Macbeth, Washington, D. C., on brief, for respondent.

Before DUNIWAY, Senior Circuit Judge, BOOCHEVER, Circuit Judge, and TAYLOR,* Senior District Judge.

BOOCHEVER, Circuit Judge:

This case involves the applicability of the anti-pollution requirements of the Clean Air Act, section 111 (42 U.S.C. § 7411), and the regulations promulgated under that section. Sierra Pacific Power Company and Idaho Power Company appeal Environmental Protection Agency (EPA) decisions holding that Unit 2 of their coal-fired power plant must conform to the stringent anti-pollution regulations promulgated by the EPA in 1978. The power companies argue that they had "commenced construction" of Unit 2 prior to September 19, 1978, and are therefore exempt from proposed standards promulgated on that date. The EPA interpreted its regulations to require actual physical construction of or a binding construction contract for Unit 2, independent of Unit 1, prior to the relevant regulatory date, and refused to consider planning and design activity. Because the EPA did not abuse its discretion in so interpreting its regulations, we affirm.

FACTS

Sierra Pacific Power Company and Idaho Power Company (Sierra Pacific) are jointly constructing[1] a coal-fired electric power plant at North Valmy Station in Humboldt County, Nevada. The plant consists of two boilers (Unit 1 and Unit 2) which are located at the same site and share common equipment. In two separate decisions, the EPA determined that Sierra Pacific had not "commenced construction" on Unit 2 before September 19, 1978, the date the EPA proposed new, more restrictive regulations. The EPA therefore determined that Sierra Pacific would have to meet the more stringent air pollution equipment requirements contained in the proposed regulations. Unit 1 is exempt from the 1978 regulations because construction of that unit was commenced prior to September 19, 1978. Sierra Pacific has appealed the Unit 2 EPA determinations directly to this court pursuant to 42 U.S.C. § 7607(b)(1).[2]

A.  Statutory and Regulation Background

In 1970, Congress extensively amended the Clean Air Act of 1955, for the first time enacting a comprehensive program to combat air pollution at both the state and federal level. Pub.L.No. 91–604, 84 Stat. 1676 (1970). Section 111 of the Act authorized the EPA to issue regulations for new stationary sources of air pollution, which would include such facilities as power plants. In 1971, the EPA issued "new source performance standards" for coal-fired power plants such as Sierra Pacific's, requiring the use of either a high-grade

* The Honorable Fred M. Taylor, Senior United States District Judge for the District of Idaho, sitting by designation.

1.  Sierra Pacific initiated the power plant project, and Idaho Power did not become involved until early 1978. The companies entered into a formal agreement to share the costs of construction, ownership, and operation of North Valmy Station in December 1978. We have referred to this joint venture as "Sierra Pacific" throughout the opinion.

2.  Section 307(b) of the Clean Air Amendments of 1977, as codified at 42 U.S.C. § 7607(b)(1), provides in part:
    A petition for review of ... any other final action of the Administrator under this chapter ... [Chapter 85, Air Pollution Prevention and Control, 42 U.S.C. § 7401 et seq.] which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit.
    The Supreme Court recently held that this language broadens the jurisdiction of the Court of Appeals to any final EPA action, not just those specifically enumerated in § 7607(b)(1). Harrison v. PPG Industries, Inc., 446 U.S. 578, 589, 100 S.Ct. 1889, 1896, 64 L.Ed.2d 525 (1980). We note that the District of Columbia Circuit has exclusive jurisdiction to review "any standard of performance or requirement under § 7411 of this title ...," and therefore in this circuit Sierra Pacific may only challenge the application and interpretation of the EPA regulations, not their validity. 42 U.S.C. § 7607(b)(1).

(low sulfur) type of coal, or the installation of flue gas desulfurization equipment, commonly called "scrubbers."[3] 36 Fed.Reg. 24876 (Dec. 23, 1971). Both units of Sierra Pacific's proposed plant were originally designed to meet these requirements by burning high-grade coal, and did not contemplate scrubbers.

In 1977, Congress amended section 111 of the Clean Air Act and directed the EPA to issue regulations requiring new pollution sources to use the best adequately demonstrated technology available. Pub.L.No. 95–95 § 109, 91 Stat. 685 (1977). *See* H.R. Rep.No. 1175, 94th Cong., 2d Sess. 156–59 (1976). Section 111 now provides in part that "[a]ny new or modified fossil fuel fired stationary source which *commences construction* prior to the date of publication of the proposed revised standards shall not be required to comply with such revised standards." 42 U.S.C. § 7411(b)(6) (emphasis added). On September 19, 1978, the EPA published the proposed revised standards,[4] which, in effect, required scrubbers on all coal-fired power plants above a certain size. 43 Fed.Reg. 42154 *et seq.* (1978); 40 C.F.R. § 60.40a (1980). Because Sierra Pacific had entered into a binding construction contract for Unit 1 prior to September 19, 1978, this unit is exempt from the new regulations. The issue in this case is whether Sierra Pacific "commenced construction" on Unit 2 prior to September 19, 1978. If not, the company will be forced to install a scrubber on Unit 2.

**3.** Scrubbers are presently the best technological system for removing sulfur dioxide. *See* H.R.Rep.No. 1175, 94th Cong.2d Sess. 161 (1976).

**4.** The statute directed the EPA to promulgate the revised standards by August 7, 1978. 42 U.S.C. § 7411(b)(6). The EPA was unable to meet this deadline, first publishing proposed regulations on September 19, 1978. Although the final regulations were not published until June 11, 1979, 44 Fed.Reg. 33580, the September 19, 1978, date controls for determining when construction commenced. *See United States v. City of Painesville*, 644 F.2d 1186 at 1190 (6th Cir. 1981).

**B. History of Sierra Pacific's Construction**

Sierra Pacific initially began planning the North Valmy power plant in 1974. There is no dispute that the company planned to build both units from the very beginning. In 1975 its Board of Directors authorized construction of both units. On February 17, 1976, Sierra Pacific contracted with Babcock and Wilcox to purchase and construct the boiler for Unit 1. Sierra Pacific had an option for the purchase and construction of the Unit 2 boiler which it never exercised. Also in 1976, Sierra Pacific prepared an environmental report which it filed with the State of Nevada. The company received certification from Nevada for the entire project in several stages in late 1976 and 1977. On December 19, 1977, it received a permit for physical, on-site construction of Unit 1 and some common facilities for both units from the Nevada Public Service Commission. Nevada Utility Environmental Protection Act, Nev.Rev.Stat. § 704.865. The state advised Sierra Pacific that it should apply for the Unit 2 permit after determination of the role Unit 2 was to play in the company's overall load and supply program.

On April 4, 1978, the EPA issued a "prevention of significant deterioration" permit for the entire project as it was then planned, which did not include scrubbers. Issuance of such a permit merely indicates that the EPA believes the plant will not result in significant deterioration of the ambient air quality; the permit does not excuse compliance with the new source pollution standards of 40 C.F.R. Part 60.[5] On

**5.** The permit granted to the power company specifically stated that:

This Approval to Construct/Modify a stationary source grants no relief from the responsibility for compliance with any other applicable provision of 40 C.F.R. Parts 52, 60 and 61 or any applicable Federal, State, or local regulations.

Prevention of significant deterioration permits are only required in "clean air" areas, where the overall level of pollutants is below national levels set by the EPA. 42 U.S.C. § 7470 *et seq.*; 40 C.F.R. § 52.21. Sierra Pacific's plant is being constructed in a clean air area, and the EPA found, by issuing the company a permit, that its plant would not cause significant deterioration of the existing air

September 12, 1978, Sierra Pacific appeared before the Nevada State Environmental Commission requesting a one-year extension on the expiration date for its Unit 2 construction certificate. A company representative, Mr. Saibini, told the Commission that "only preliminary design work has been done on the [Unit 2] boiler" because the company had been unable to enter into a binding contractual commitment. The request for an extension was granted, and the Unit 2 permit was finally issued on March 26, 1979. Therefore, on September 18, 1978, the last day to "commence construction," the company had an on-site construction permit for Unit 1, but by its own statements was not ready to complete its application for a permit or begin actual construction on Unit 2. On April 11, 1979, Sierra Pacific contracted with the Foster Wheeler Company for the purchase of the Unit 2 boiler.

The company notified Region IX of the EPA that actual construction commenced on Unit 1 and some of the common facilities on September 11, 1978. At this time, then, approximately a week before the EPA proposed its new regulations, the company had received all necessary state air quality permits and its federal prevention of significant deterioration permit, and had begun design and engineering work for both units.

Significantly though, the company had not yet entered into a boiler contract, received on-site construction permits, or begun actual construction on Unit 2. The company was aware that Unit 2 might be governed by the 1978 regulations, and therefore requested an EPA determination on the matter.

C. EPA Proceedings

On April 4, 1979, in response to Sierra Pacific's request, the Nevada regional office of the EPA informed the company that Unit 2 was covered by the new regulations because the company had not entered into either a binding construction contract or a continuous program of construction. The company appealed this decision to EPA headquarters in Washington. Pending a final determination, Sierra Pacific officials met with the EPA and submitted cost information indicating its losses if the new source performance standards compliance was required. It hoped that this information would show a continuous program of construction. Sierra Pacific's "lost investments" included: (1) design and engineering costs, (2) capital costs, (3) premium coal contracts, (4) environmental studies, and (5) costs incurred by delayed construction. These costs allegedly totaled over $35 million.[6]

quality. The new stationary source pollution regulations, on the other hand, are designed to preserve and *enhance* air quality where possible, and all "new sources" are required to comply with the regulations regardless of the ambient air quality. For a thorough discussion of the provisions and interpretation of the prevention of significant deterioration regulations, see *Citizens to Save Spencer County v. E. P. A.*, 600 F.2d 844 (D.C.Cir.1979).

**6.** Sierra Pacific's alleged losses can be broken down as follows: (a) $852,582 for the preparation of engineering studies, flow diagrams, etc., that cannot be applied to Unit 2 if a scrubber is incorporated; (b) $205,000 in capital expenditures incurred in modifying the coal and ash handling systems and various electrical equipment to accommodate a scrubber; (c) $2,359,302 expended for premium (low-sulfur) coal contracts, such coal being unnecessary for Unit 2 if equipped with a scrubber; (d) $250,000 for environmental studies that may have to be redone for Unit 2; and (e) $31,500,000 due to increased construction costs and purchase of

replacement power during the estimated one year delay caused by compliance with the new regulations. These estimated costs total $35,166,884. Sierra Pacific asserts these amounts total $34,916,884. The company neglected to include the $250,000 for environmental studies in computing its total.

It is apparent that the bulk of the company's "lost investment" consists of a projected loss due to construction delays in the future. This is obviously not a sunk cost. In both determinations, the EPA suggested that many of these costs were either avoidable (notably the estimated cost of delay), exaggerated, or necessary costs of new source standards compliance regardless of when construction commenced. In its final May 23, 1980, determination, however, the EPA concluded that none of the alleged lost investments constituted "construction" within the regulatory definition. 40 C.F.R. § 60.2(g). Because we find that the EPA reasonably interpreted its regulations by not considering the extent of Sierra Pacific's asserted costs, we do

On August 24, 1979, the EPA issued a "final determination" requiring Sierra Pacific to comply with the 1978 regulations for Unit 2. This determination carefully analyzed each of the company's claimed expenses and found that most of the costs were merely costs of compliance, and were not increased by any forced changes in its existing construction plans. In addition, the EPA found that some of the increased expense was de minimis in relation to the overall project cost. Due to confusion over the appropriate jurisdictional forum, Sierra Pacific challenged this determination in both the federal district and circuit courts.[7]

On May 23, 1980, before any substantive action in either federal court, the EPA issued a revised determination which revoked and replaced the 1979 determination. Based on different grounds, the new determination reached the same result, namely that Sierra Pacific must comply with the new regulations for Unit 2. In the later opinion the EPA rejected use of the "lost investments" test. It stated that none of the lost investments were directly related to the "fabrication, erection, or installation" of the boiler for Unit 2, and therefore the investments were inappropriately considered in the first EPA determination. 40 C.F.R. § 60.2(g). The EPA interpreted its regulations to require either a contract or actual construction on the boiler unit itself, and therefore Sierra Pacific had not "commenced construction."

Sierra Pacific has appealed the 1979 and the 1980 determinations directly to this court. Both appeals have been consolidated, and the parties have jointly agreed to dismiss the district court suit. The sole issue is whether the EPA abused its discretion in determining that Sierra Pacific had not commenced construction of Unit 2 prior to September 19, 1978.

## I. STANDARD OF REVIEW

Sierra Pacific has not challenged the validity of the EPA regulations, and if they had we would be without jurisdiction to hear such a claim. 42 U.S.C. § 7607(b)(1). The question, then, is whether the EPA properly interpreted its regulations. Section 307 of the Clean Air Act sets forth the standard for review. We may overturn the EPA determination that Unit 2 is subject to the stricter pollution control regulations only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Oljato Chapter of Navajo Tribe v. Train*, 515 F.2d 654, 667 (D.C.Cir.1975). An appellate court will ordinarily give substantial deference to a contemporaneous agency interpretation of a statute it administers. When dealing with an interpretation of regulations the agency has itself promulgated, "deference is even more clearly in order." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

We have held that the EPA's interpretation of its regulations is entitled to great deference, even where, as here, it has overruled or questioned its own prior interpretations. *Montana Power Co. v. E. P. A.*, 608 F.2d 334, 346–48 (9th Cir. 1979). *See Kenai Peninsula Borough v. State of Alaska*, 612 F.2d 1210, 1214 n.8 (9th Cir. 1980). Therefore Sierra Pacific must overcome a strong presumption of validity to establish that the EPA incorrectly interpreted its regulations. We are not permitted to "substitute [our] judgment for that of the agency." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823; *Montana Power*, 608 F.2d

---

not need to decide whether any of the costs are legitimate lost investments.

**7.** Prior to the Supreme Court decision in *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (*see* note 2 *supra* ), it was unclear whether a challenge to an EPA action such as the one in the instant case should be filed in the federal district or

circuit court. *PPG Industries, Inc. v. Harrison*, 587 F.2d 237, 242–45 (5th Cir. 1979). Therefore Sierra Pacific simultaneously filed a petition for review in the District Court for Nevada (Civ.R. 79–229 BRT) and in this court (No. 79–7542). After the Supreme Court decision, a joint motion to dismiss was granted by the district court.

at 344. We are nevertheless mindful of our obligation to make a "searching and careful" inquiry into the facts to determine the reasonableness of the EPA's interpretation, under the standard of deference discussed above. *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823.

## II. UNIT 2 AS A SEPARATE FACILITY

█ Section 111 of the Clean Air Act Amendments of 1977 exempts new stationary sources that have commenced construction prior to publication of the new proposed regulations, but the statute does not define the term "commenced construction." *See* 42 U.S.C. §§ 7411(a), (b)(6). The 1978 regulations define "construction" as:

fabrication, erection, or installation of an affected facility.

40 C.F.R. § 60.2(g). With respect to a new source, "commenced" means that

an owner or operator has undertaken a continuous program of construction or modification *or* that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification.

40 C.F.R. § 60.2(i) (emphasis added). Unit 1 of Sierra Pacific's plant meets the "contractual obligation" test of the regulation, and Sierra Pacific argues that Unit 2 meets the alternative "program of construction" test. The EPA, however, interpreted the word "program" in light of the physical emphasis in the definition of construction, and therefore found that Sierra Pacific had not commenced construction.

Initially we note that the EPA may properly analyze the state of construction on just one unit of a two-unit project. The statute and regulations apply to "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. § 7411(a)(3). The regulations further explain that "facilities" include "*[e]ach fossil-fuel-fired steam generating unit*," 40

C.F.R. § 60.40(a)(1) (emphasis added), and define "unit" as a separate "furnace or boiler used in the process of burning fossil fuel . . ." 40 C.F.R. § 60.41(a). Therefore the EPA must look to the Unit 2 boiler facility, by itself, in determining whether construction has commenced, and disregard the progress of construction on Unit 1, or on the facilities that will be shared by both units.[8]

This principle was made clear by the District of Columbia Circuit in a similar context. In *ASARCO Inc. v. E. P. A.*, 578 F.2d 319 (D.C.Cir.1978), the court evaluated proposed EPA regulations defining a "stationary source" under 42 U.S.C. § 7411 as including, under some circumstances, a combination of facilities. Under this so-called "bubble concept," an industry would be permitted to balance an increase in pollution from one source with a matching decrease in pollution from another source so long as the "net" pollution level from the "facility" remained the same. The court vacated the regulations and remanded to the EPA because the term "affected facility" is not synonymous with an entire plant. 578 F.2d at 323. The court held that the regulations must result in individual assessment for each energy producing unit.

In *Alabama Power Co. v. Costle*, 636 F.2d 323, 395–98 (D.C.Cir.1979), the District of Columbia Circuit reaffirmed the *ASARCO* holding that the bubble concept was an improper regulatory application of the new source performance standards. The *Alabama Power* court held, however, that it was proper for the EPA to look to the entire facility before issuing a prevention of significant deterioration permit, because of the different purposes of these two EPA functions. *Id.* The *Alabama Power* court was also faced with a power company challenge to EPA prevention of significant deterioration regulations which in effect required a separate "commenced construction" date for each unit of a multi-boiler

---

**8.** Because the EPA looks exclusively to construction on the boiler unit itself, it was reasonable to disregard the progress on construction common to both units, such as the coal and ash

handling systems, site preparation, access roads and temporary housing for construction workers.

power plant. 40 C.F.R. § 52.21(s)(2) (1978); 43 Fed.Reg. 26388, 26396 (1978). Relying on the EPA's considerable discretion, the court found that the challenged regulatory standards were a reasonable interpretation of the Clean Air Act. 636 F.2d at 409–11.

Therefore, the EPA properly looked to the state of construction on Unit 2, independent of Sierra Pacific's progress on Unit 1. Furthermore, the regulations make it clear that construction is to be interpreted with regard to the "facility" or boiler itself, not the related construction necessary for the entire project.

## III. COMMENCEMENT OF CONSTRUCTION

■ The EPA's 1980 determination in the instant case states that a power company can meet the regulatory test determining when construction is "commenced" by showing either: (1) a contractual obligation, or (2) a continuous program of construction.

Although the EPA might have adopted the company's broad reading of the word "program" so as to include planning and design of a unit, failure to do so was not an abuse of discretion. The only court we are aware of that has considered this issue held that the EPA interpretation ignoring planning and preliminary purchases for a unit not yet under physical construction was a "reasonable interpretation." *United States v. City of Painesville*, 431 F.Supp. 496, 500 n.5 (N.D.Ohio 1977), *aff'd*, 644 F.2d 1186 (6th Cir. 1981). The EPA in the *Painesville* case found that construction of a new boiler unit in a plant was only in the planning stages, and it interpreted 40 C.F.R. § 60.2(i) to require either a binding contract or actual construction. The district court, agreeing with the EPA, found that construction "had not progressed to the point that a change in its design would have required the facility already erected to be modified

in order to insure that it could comply with the [new standards]." 431 F.Supp. at 501. The court further noted that had Congress intended the EPA to consider planning or design of a project, it would have used those terms instead of the word "construction." 431 F.Supp. at 501 n.8.[9]

The Sixth Circuit agreed that the EPA properly interpreted its own regulations, and affirmed the district court. At 1190. The appellate court also extensively discussed the congressional intent of Section 7411, and found that concern for the environment was a more important consideration than the costs borne by industry. At 1190–1193.

Citing only a dictionary as authority, Sierra Pacific contends that "program" of construction necessarily includes planning and design work. "Program" is not defined in the regulations. *See* 40 C.F.R. § 60.2. It is reasonable, however, for the EPA to interpret "program of construction" in terms of the definition of construction: "fabrication, erection, or installation," which suggests physical activity.

If the EPA adopted the power company's broad construction of the word "program," construction would have commenced in 1974 when Sierra Pacific first decided to build the plant. Under this approach, power companies could be building power plants well into the next decade under the technologically outdated 1971 regulations. The EPA approach of looking to physical construction on the boiler itself is not only a reasonable interpretation of the definitions in 40 C.F.R. §§ 60.2(g) and (i), but also provides a more workable test for determining the commencement of construction.

Sierra Pacific finally contends that the congressional intent for excusing new sources under construction from the stricter pollution standards was to avoid excessive

9. Sierra Pacific contends that *United States v. Public Service Co. of Indiana*, 12 E.R.C. 1495 (S.D.Ind.1977), took the opposite view from that expressed in *Painesville*. In the *Public Service* case, however, the court did not specifically address the program of construction language. The court recognized that the regula-

tions (40 C.F.R. § 60.2(d), (e), (g) and (i)) define "new source" to be the individual piece of apparatus or boiler facility, but purported to hold these regulations invalid. 12 E.R.C. at 1502. The court failed to consider whether it had jurisdiction to pass on the validity of the regulations themselves. *See* 42 U.S.C. § 7607(b).

economic waste from abandonment or alteration of a program of construction. The legislative history of the Clean Air Act of 1970 and of the 1977 amendments, however, does not discuss the purpose of the "commenced construction" language. Although it is reasonable to assume that Congress included this language to prevent economic waste there is nothing to indicate where Congress wanted the line between protection of the environment and costs to the regulated utility to be drawn.

The history of the Clean Air Act does indicate how important Congress believed it was to enhance air qualify by strictly regulating all new stationary sources of pollution. For this reason, the 1977 amendments require the use of the best adequately demonstrated technology rather than permit reliance on certain types of fuel such as low sulfur coal. H.R.Rep.No. 294, 95th Cong., 1st Sess. 11, *reprinted in* [1977] U.S.Code Cong. & Ad.News 1077, 1088.

In determining congressional intent the EPA was justified in balancing solicitude for industrial costs with strong statements of environmental concern contained in the Committee Reports.[10] *See United States v. City of Painesville*, 644 F.2d 1186 at 1191–1193 (6th Cir. 1981). Congress left to the EPA the final determination of which new sources were to be covered by the 1978

regulations, and Sierra Pacific has not shown that the EPA abused its discretion by drawing the line for determining the commencement of construction at the stage of physical "fabrication, erection, or installation" of a boiler unit, or when the power company can show a binding contract for boiler purchase.

## IV. REJECTION OF THE LOST INVESTMENTS TEST

■ Sierra Pacific's final contention is that the EPA improperly failed to consider evidence of lost investments. The EPA's 1979 ruling creates the impression that when the magnitude of lost investments reaches large enough proportions it might justify grandfathering a construction project under the 1971 standards. In its 1980 ruling, the agency stated that the magnitude of lost investments was, by itself, irrelevant. Instead, a permit applicant would be required to show that lost investments fit into two narrow categories: either that money was spent on actual physical construction related to a particular unit, or that money would be lost from a forced breach of a construction contract.

In this case it was conceded that there was no contract for the construction of Unit 2.[11] The EPA also determined that all the

---

**10.** Senator Muskie expressed the need for new source performance standards as follows:

> Those areas which have levels of air quality better than the national standards should not find their air quality degraded by the construction of new sources.

I Legislative History of the Clean Air Act Amendments of 1970, at 125. With this goal in mind, Congress enacted section 111 of the Clean Air Act, designed to insure that stationary sources would be "equipped, operated, and maintained so as to reduce emissions to a minimum." II Legislative History, *id.* at 415–16.

In 1977 Congress was compelled to strengthen the new source standards because the existing regulations were inadequate to protect air quality or meet the economic goals of the 1970 legislation. Section 111 of the Act was amended to require the "best technological system of continuous emission reduction which . . . has been adequately demonstrated." 42 U.S.C. § 7411. To justify this heightened standard, the House Committee Report accompanying the 1976 Bill which in substance became the

1977 Act cites strong support from a number of public and private agencies. As the National Academy of Sciences advised, "even use of best available technology by new sources may not be sufficient to prevent serious 'irreversible environmental damage' in the foreseeable future." H.R.Rep.No. 1175, 94th Cong., 2d Sess. 160–65 (1976).

**11.** To support its contention that the EPA abused its discretion, Sierra Pacific alleges that there has been disparate administrative treatment of similarly situated companies. *See Hughes Air Corp. v. C. A. B.*, 482 F.2d 143, 145–46 (9th Cir. 1973). Neither EPA determination Sierra Pacific relies on to show that rejection of the lost investments test was arbitrary is on point. Both cases involved situations where a power company had already entered into a binding contract for construction of a facility. *See* City of Fayetteville determination (EPA determination of Feb. 13, 1978) and the Cayuga Station determination (EPA determination of June 9, 1978). In the instant case,

lost investments claimed by Sierra Pacific related to activities that were connected with other elements of the construction project, or related to planning activities. None related to actual physical construction of Unit 2. Because none of the investments fell into the appropriate categories, the agency concluded that Sierra Pacific's lost investments claim failed to establish that the company had "commenced construction."

 Sierra Pacific has raised the additional problem that the EPA first requested information on lost investments, then applied that test, and later rejected it, after the company initiated federal litigation. The company contends that the EPA could not abandon the lost investments standard having once applied it in the 1979 determination.

In *Montana Power Co. v. E. P. A.*, 608 F.2d 334 (9th Cir. 1979), this court upheld the EPA's use of a "substantial loss" test.[12] The court, however, was only interpreting the "contractual obligation" test of the "commencement" definition. 40 C.F.R. § 52.21(b)(7); *Id.* at 345. *Montana Power* found that the EPA did not abuse its discretion by applying a "new and different rationale" to evaluate the progress of construction, even though similarly situated power plant projects were evaluated under a different test. *Id.* at 348–49. We made it very clear that substantial deference is given to the EPA in interpreting its own regulations. The EPA is not strictly bound by its earlier interpretations, even though they may be "apparently inconsistent," *id.* at 346, and the EPA is "free to make reasonable changes" in interpretation. *Id.* at 348. Therefore, even though Sierra Pacific may have initially been misled by what test the EPA would apply, the EPA did not abuse its discretion in changing its reasoning.

Sierra Pacific did not have a contract for the Unit 2 boiler.

12. In *Montana Power*, the EPA was interpreting the prevention of significant deterioration statute and regulations, not the new source

 It was perhaps unwise for the EPA to issue a second determination with conflicting reasoning, particularly after commencement of federal litigation, but it did not amount to an abuse of discretion. Sierra Pacific suffered no demonstrable harm; the result reached in each case was the same. Therefore, we hold that the 1980 determination effectively "revoked and replaced" the 1979 determination. The rationale utilized in the 1980 determination was a reasonable interpretation of 40 C.F.R. Part 60, and therefore the 1980 determination is

AFFIRMED.

standards at issue in this case. 42 U.S.C. § 7470 *et seq.* The regulatory definitions of "construction" and "commenced," however, are identical. *See* 40 C.F.R. §§ 52.21(b)(7), (8); note 5 *supra.*