**PHELPS DODGE CORPORATION, Petitioner,**

v.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION; Secretary of Labor, Mine Safety and Health Administration (MSHA); and United Steelworkers of America, Local 616, Respondents.**

**United Steelworkers of America, AFL–CIO, Local Union 616, Intervenor.**

No. 81–7251.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1982.

Decided July 22, 1982.

James G. Speer, Evans, Kitchel & Jenckes, Phoenix, Ariz., argued, for petitioner; Stephen W. Pogson, Evans, Kitchel & Jenckes, Phoenix, Ariz., on brief.

Ann S. Rosenthal (T. Timothy Ryan, Sol. of Labor; Cynthia L. Attwood, Associate Sol.; Michael A. McCord, Counsel for Appellate Litigation; Leslie J. Canfield on the brief) Washington, D. C., for respondent Sec. of Labor.

Mary-Win O'Brien, Pittsburgh, Pa.; Bernard Kleiman, Chicago, Ill., for respondent United Steelworkers of America.

James A. Lastowka, Washington, D. C., for respondent Fed. Mine Safety and Health Review Comm.

Before SNEED, POOLE and BOOCHEVER, Circuit Judges.

SNEED, Circuit Judge:

Phelps Dodge Corporation (petitioner) petitions for review of a final order of the Federal Mine Safety and Health Review Commission (MSHRC). Our jurisdiction is under 30 U.S.C. § 816(a)(1). The sole question for decision is whether a mine safety regulation, 30 C.F.R. § 55.12–16, was properly applied to justify the issuance of a citation and levy of a fine. The regulation, in this particular factual setting, did not give fair warning that it was applicable to petitioner's conduct. Accordingly, we reverse.

## I.

### FACTS

Petitioner operates an open-pit copper mine, a mill and a smelter at Morenci, Arizona. The copper production process commences with the loading of stones and rocks, which contain copper ore, into trucks for transportation to the mill. There, the ore is dumped into a chute which carries it downward into the mill. It then falls onto the "panfeeder," an electrically powered steel conveyor belt which carries the ore forward for smelting. The panfeeder is an electrically powered mechanical device; the chute is not.

The rocks and stones occasionally clog the drop chute, necessitating the use of manual labor to clear the path to the panfeeder. This might occur as often as twice a week or as infrequently as once a month. Sometimes the workers can clear up a jam with one or two thrusts of a crowbar. However, the panfeeder is sometimes used to assist in this process. The panfeeder is turned on, moved a little way and then turned off, thus moving loose stones out of the way and facilitating access to the rocks remaining lodged in the chute. The panfeeder is operated by a button in a nearby control panel which must be pushed with the finger into a sleeve. When the panfeeder is used to help clear ore jams, it is shut off at this control panel.

Occasionally, the panfeeder is inspected or requires maintenance or repair. In those instances, a special process is used, under which the panfeeder, in addition to being turned off at the control box as when jams are cleared, is locked out. This is done by locking out a switch located in a distant control room. To accomplish this, an electrician goes to the control room and manually locks out the power switch controlling the panfeeder. He also places warning tags on the switch to provide notice to anyone in the area that the equipment is intended to be locked out.

On June 6, 1979, a MSHA inspector walked into the panfeeder area at a time when ore was lodged in the drop chute. The crusher operator and the foreman were dislodging the ore in the chute and were standing on the panfeeder at the time. The panfeeder was turned off at the control box; however, it was not locked out. The crusher operator and the foreman were the only personnel in the area. The MSHA inspector issued an Order predicated upon the failure to lock-out the panfeeder under 30 C.F.R. § 55.12–16.[1]

Petitioner contested the penalty assessed by MSHA. Thereafter, the Secretary of Labor (Secretary) filed a proposal for assessment of civil penalty with the Federal Mine Safety and Health Review Commission in accordance with Section 105(d) of the Mine Act, 30 U.S.C. § 815(d). A hearing was held on January 20, 1981, before an Administrative Law Judge (ALJ) who concluded that a violation of 30 C.F.R. 55.12–16 had occurred.

The ALJ found that removal of rocks from the chute was "mechanical work" within the meaning of 30 C.F.R. 55.12–16. He then addressed the issue whether such "mechanical work" was done on "electrically powered equipment." He concluded that it was. While he recognized that the chute was not electrically powered, the fact that the panfeeder was supplied the "electrically powered equipment" requirement. The ALJ found that the movement of rock down the chute and onto the panfeeder was one integral process involving "electrically powered equipment," *viz.*, the panfeeder. He concluded that although the work being done pertained to the chute, the operation of the panfeeder and the chute was indivisible. In this way, work on the chute was equivalent to work on the panfeeder which required its locking out under 30 C.F.R. § 55.12–16.

On March 24, 1981, Phelps Dodge's petition for discretionary review with the Commission pursuant to Section 113(d)(2)(A) of the Mine Act, 30 U.S.C. § 823(d)(2)(A), was denied. Phelps Dodge then filed a petition for review with this court pursuant to Section 106(a)(1) of the Mine Act, 30 U.S.C. § 816(a)(1).

## II.

### MEANING OF THE REGULATION

██ Phelps Dodge has not challenged the facial validity of the MSHA regulation,

---

1. This regulation reads as follows:

Electrically powered equipment shall be deenergized before mechanical work is done on such equipment. Power switches shall be locked out or other measures taken which shall prevent the equipment from being energized without the knowledge of the individu- als working on it. Suitable warning notices shall be posted at the power switch and signed by the individuals who are to do the work. Such locks or preventive devices shall be removed only by the persons who install- ed them or by authorized personnel.

30 C.F.R. § 55.12–16, but, rather, whether MSHA properly applied the regulation in this specific factual setting. The Secretary[2] correctly notes that an agency's interpretation of its own regulation is entitled to great deference. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Magma Copper Co. v. Secretary of Labor*, 645 F.2d 694, 696 (9th Cir.), *cert. denied*, 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981). However, the application of a regulation in a particular situation may be challenged on the ground that it does not give fair warning that the allegedly violative conduct was prohibited. *See Daily v. Bond*, 623 F.2d 624, 626–627 (9th Cir. 1980) (per curiam). In all events, we are required to make a careful inquiry to determine the reasonableness of the administrative interpretation and application of the regulation. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Sierra Pacific Power Co. v. U. S. Environmental Protection Agency*, 647 F.2d 60, 66 (9th Cir. 1981). Finally, our standard of review is whether the agency's determination is arbitrary, capricious or an abuse of discretion. 5 U.S.C. § 706(2)(A).

Phelps Dodge contends that the regulation has been incorrectly applied in this case because its basic purpose, fairly read, is to protect workers from the hazards of electrical shock, not such hazards as may attend removal of rocks from the chute. On the other hand, the Secretary urges that the regulation does apply. He relies heavily on the ALJ's findings and reasoning. And he asserts that the relevant legislative and regulatory histories establish that the regulation was intended to be applied in this fact situation.

Turning to the plain language and meaning of 30 C.F.R. § 55.12–16 and related regulations, we note that section 55.12–16

has been placed under the heading "Electricity." It is sandwiched between regulations whose purpose is manifestly to prevent the accidental electrocution of mine workers. The immediately preceding regulations, to illustrate, set out procedures to ensure that workers will not be exposed to energized wires, cables or high potential electrical conductors. 30 C.F.R. §§ 55.12–10 through 55.–12–14.[3] The immediately antecedent regulation, 30 C.F.R. § 55.12–17, requires that power circuits be deenergized before work is done on them. Other regulations in 30 C.F.R. § 55.12 also are directed to abatement of the danger of electrical shock. They simply do not address the hazards arising from the accidental movement of electrical equipment while mechanical work is being done thereon.[4]

Prevention of electrical shock also emerges from the language of section 55.–12–16 itself. It requires that "[e]lectrically powered equipment shall be *deenergized* before mechanical work is done on such equipment." 30 C.F.R. § 55.12–16 (emphasis added). According to *Webster's Third International Dictionary of the English Language* 589 (1971) (unabridged), "deenergize" means "to check the flow of current through an electric device." This mandate to cut off the flow of electric current, particularly when read in conjunction with the other regulations in 30 C.F.R. § 55.12, strongly suggests that protection from electric shock is the regulation's main concern.

This conclusion is supported by a related regulation, 30 C.F.R. § 55.14–29. Under the heading "Use of Equipment," this regulation provides that:

Repairs or maintenance shall not be performed on machinery until the power is off and the machinery is *blocked against motion*, except where machinery motion is necessary to make adjustments.

---

2. Since the Secretary filed a single brief on his behalf and on behalf of MSHA, we refer to both respondents as the "Secretary."

3. The numerically preceding regulation, 30 C.F.R. § 55.12–15 is "Reserved."

4. Interestingly, 30 C.F.R. § 55.14 is entitled "Use of Equipment." The regulations in this section more clearly address the problem of accidental equipment start-ups than do those of 30 C.F.R. § 55.12, which, as previously noted, are under the heading "Electricity."

30 C.F.R. § 55.14–29 (emphasis added). Thus, when the intent is to protect against the danger of machinery motion, the regulation requires that the machinery be "blocked against motion," not "deenergized."

The relevant legislative and regulatory histories, however, provide little comfort either to the petitioner or the MSHA.[5] These merely establish that the general purpose of all regulations promulgated under the enabling statute was to promote safe working conditions for miners.[6]

▮ We conclude that it was an abuse of discretion to apply section 55.12–16 to the facts of this case. The regulation inadequately expresses an intention to reach the activities to which MSHA applied it. Therefore, we join in the observation: "If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." (citations omitted). *Diamond Roofing Co., Inc. v. Occupational Safety*

*and Health Review Commission*, 528 F.2d 645, 649 (5th Cir. 1976).

Accordingly, the regulation cannot serve as the basis for issuance of the citation or for the levy of the fine.

REVERSED.

BOOCHEVER, Circuit Judge, dissenting:

I respectfully dissent.

I am not convinced that the scope of the regulation must be limited to electrical shock hazard. 30 C.F.R. § 55.12–16 provides that "Electrically powered equipment shall be deenergized before mechanical work is done on such equipment." This language is clear and unambiguous. Nothing limits it to situations involving danger from shock as opposed to those involving unexpected activation of equipment. Although the other provisions in section 55.12 go to electrical shock hazards, I do not believe that this is a sufficient reason for us to hold that the agency abused its discretion in declining to read such a limitation into the plain language of § 55.12–16.[1] We ordinarily defer to an agency's reasonable in-

---

**5.** The legislative history of the current and predecessor enabling statutes, 30 U.S.C. § 811 and 30 U.S.C. § 725, can be found respectively at Senate Comm. on Human Resources, Federal Mine Safety and Health Act of 1977, S.Rep. No. 181, 95th Cong., 1st Sess. 1–194, *reprinted in* 1977 U.S.Code Cong. & Ad.News 3401–3484; Conf.Comm. Federal Mine Safety and Health Act of 1977, H.R.Conf.Rep. No. 655, 95th Cong., 1st Sess. 37–68, *reprinted in* 1977 U.S. Code Cong. & Ad.News 3485–3516.

Senate Committee on Labor and Public Welfare, Federal Coal Mine Safety Act Amendments of 1965, S.Rep. No. 1055, 89th Cong., 2d Sess. 1, *reprinted in* 1966 U.S.Code Cong. & Ad.News 2072–2088.

The regulatory history of all regulations promulgated in 30 C.F.R. § 55.12 can be found at 34 Fed.Reg. 12504 (1969), as amended at 35 Fed.Reg. 3664 (1970); 35 Fed.Reg. 4515 (1970); 35 Fed.Reg. 13588 (1970); 37 Fed.Reg. 14370 (1972); 39 Fed.Reg. 24317 (1974); 42 Fed.Reg. 29419 (1977); 42 Fed.Reg. 36462 (1977); 42 Fed.Reg. 57040 (1977); 44 Fed.Reg. 48517 (1979).

**6.** The Secretary also argues that the transcript of the public meeting of the advisory committee which preceded the promulgation of what is now 30 C.F.R. § 55.12–16, establishes that the application is correct. Transcript of the Meeting of the Federal Metal and Non-metal Mine

Safety Advisory Committee, pp. 175–194, May 8, 1975.

After a careful examination of this transcript, we are unable to agree with the Secretary. It is true that the Advisory Committee discussion did address the danger of accidental equipment activation leading to injury due to the motion of a machine. However, that discussion focused upon an injury that might be occasioned while an employee worked to repair a motor, not upon a stationary device, such as the chute. It is true that the ALJ found that the chute and the panfeeder were a single, electrically powered unit. Nevertheless, there is nothing in the transcript to indicate that pieces of equipment, which in everyday usage are regarded as distinct, such as the panfeeder and the chute, might be considered as integrated for purposes of the regulation. Further, the transcript of the advisory committee was not published in the Federal Register, so petitioner had no notice of the committee's deliberations.

**1.** I disagree with the majority's view that reading § 55.12–16 to reach more than shock hazard would make it a mere duplication of 30 C.F.R. § 55.14–29. § 55.14–29 applies only to repairs and maintenance, while § 55.12–16 uses the potentially broader term "mechanical work."

terpretations of the regulations it administers, *Montana Power Co. v. Environmental Protection Agency,* 608 F.2d 334, 344–46 (9th Cir. 1979), and we construe safety legislation and regulations liberally to effectuate their purposes. *Magma Copper Co. v. Secretary of Labor,* 645 F.2d 694, 697 (9th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981).

I do not think that the principles of fair warning require that we limit the plain language of § 55.12–16 to situations involving electrical shock. A regulation must give fair warning of what conduct is covered. However, "mere clumsiness in drafting" is not a ground for legal attack unless the regulation is so poorly written that it is unconstitutionally vague. *Irvington Moore, Division of U. S. Natural Resources v. Occupational Safety and Health Review Commission,* 556 F.2d 431, 436 (9th Cir. 1977). Regulations must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Lloyd C. Lockrem, Inc. v. United States,* 609 F.2d 940, 943 (9th Cir. 1979). Section 55.12–16, by its terms, applies to "mechanical work" performed "on electrical equipment." These words sufficiently warn that the regulation is applicable to electrical equipment, irrespective of whether there is a specific danger of electrical shock.

It was also not improper to construe the regulation to apply to the particular facts of this case. The Administrative Law Judge treated work on the adjacent, non-electrical feeder chute as work "on electrically powered equipment." The chute, he reasoned, was part of a single integral process involving "electrically powered equipment" because it fed the electrically powered panfeeder and jawcrusher. If applied too broadly, of course, the whole mill might be treated as a single "integral process"

under this interpretation. I am not prepared, however, to say that the interpretation and resulting application of the regulation was "plainly erroneous or inconsistent with the regulation." *Udall v. Tallman,* 380 U.S. 1, 17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

The workers in this case stood upon the panfeeder while working on the chute. This fact supports the ALJ's conclusion that the chute was integrally related to the panfeeder which it was designed to feed. It was not plain error to treat at least the chute and the panfeeder as one assembly because, if the panfeeder were accidently activated while miners were standing on it in order to work on the chute, there was a danger that they would fall and be conveyed into the jaw-crusher.[2] The interpretation of "electrically powered equipment" to include the chute therefore serves the safety purposes of the regulations in that it protects workers from the hazards of accidental and unanticipated movement of electrically powered equipment after it has been shut down for mechanical work.

Finally, the agency's application of § 55.-12–16 here is consistent with its position in other recent cases. In *Secretary of Labor v. Freeport Kaolin Co.,* 2 FMSHRC 233, 241–42 (Jan. 30, 1980), the ALJ refused to hold that § 55.12–16 applied only to work on electrical parts or components of electrically powered equipment. In *Secretary of Labor v. Warner Co.,* 2 FMSHRC 972, the employer admitted a violation when a foreman failed to deenergize a screw conveyor while attempting to unblock a feeding chute.[3]

CONCLUSION

Although the Commission's construction of "work done on [electrically powered] equipment" may not be the most obvious or

---

**2.** The record indicated that Phelps-Dodge was aware of the danger to chute clearers from unexpected activation of the panfeeder. The panfeeder, although not locked out, was turned off at the local control panel, and the chute-clearers wore safety ropes while standing on the panfeeder [ER 4]. There was also testimony that the panfeeder button at the control

panel could be accidentally pushed and that it sometimes stuck on account of dust [CR 246].

**3.** The *Warner* citation was issued under 30 C.F.R. § 56.12–16, the identical counterpart of § 55.12–16 under Part 56, Safety and Health Standards—Sand, Gravel and Crushed Stone Operations.

logical one, it is not inconsistent with the language of the regulation. The Commission's interpretation need not be the only or the most reasonable interpretation. *See Kester v. Campbell*, 652 F.2d 13, 15 (9th Cir. 1981). I would therefore affirm the Secretary.